WILL OF RICE: COWIE and others, Appellants, vs. STROH-
MEYER, Executor, and others, Respondents: SAME, Re-
spondents, vs. SAME, Appellants.

*May 17—October 8, 1912.*

*Wills: Probate: Contest: Questions involved: Evidence: Jurisdiction:
Appeal from county court: Judgment: Validity: Constitutional
law: Right to make will and have it carried out: Substitution
of different scheme by parties interested: Termination of trust:
Persons under disability: Change of venue: Parties: Executors:
Settlement of accounts: Organizing equitable action on appeal:
Bringing in parties: Time for taking appeal: Issues: Payments
by order of court: Personal liability: Setting aside orders:
Waiver: Estoppel: Minors: Attorneys: Guardians ad litem:
Compensation: Appeal to supreme court: Reversal: Directions
for judgment.*

1. In a will contest, only evidence bearing on legality of execution,
testamentary capacity, and whether the instrument purporting
to be the particular person's will is such in fact, is legitimate.
2. A will contest cannot, properly, be turned into an action for
construction, reformation, or rescission, since the sole question
is whether the paper purporting to be the will of the testator
represents his legally declared final wishes as to the *post-
mortem* disposition of his estate.
3. On appeal from an order admitting a will to probate, the scope
of judicial power is limited by the nature of the proceeding and
the rights involved.
4. Parties interested in a testate estate are not competent to sub-
stitute their will for that of the testator so as to have the for-
mer carried out as if it were the scheme of the latter, and the
court is powerless to give validity to any such scheme.
5. Notwithstanding fatal jurisdictional error within the scope of
judicial power as to a particular subject matter, the determi-
nation involved is conclusive between the parties and their
privies respecting collateral attack.
6. In case of error by acting beyond judicial power, the result is
a usurpation and not binding on any one.
7. Whether a judgment is jurisdictionally bad for judicial error
instead of for excess of power, turns on whether the court had
jurisdiction of such subjects as the one deliberated upon.
8. Jurisdiction of the subject matter has reference not only to na-
ture of cause of action and relief sought, but judicial power

of the court, referable to its organic act and other enabling written laws.

9. A cause of action or matter legitimately deliberated upon, may, within the scope of the court's subjects of jurisdiction, be as broad as parties make it by pleadings, argument, or evidence admitted without objection, but if the court goes beyond that its determination is *coram non judice*.

10. The abstract question in any particular case as to whether the property of a deceased person shall be distributed according to the wishes of the parties interested, or claiming to be so, instead of according to the written law or the will, is not of judicial cognizance.

11. The right to make a will is more sacred than that to make a contract; the former being beyond judicial power to disturb on equitable grounds while the latter is not.

12. The right to make a will was recognized as one of first importance when the constitution of Wisconsin was adopted and enjoyment thereof was guaranteed thereby.

13. Inherent in the right to make a will there is a constitutional right to have one which is validly executed carried out according to the intent of the testator.

14. Proceedings to obtain admission of a will to probate constitute an action *in rem* to establish status to which the public is a party; but without capacity to substitute any scheme of distribution for that of the testator.

15. Upon the person designated according to law to propose a will for probate performing his duty, judicial doors open for that particular purpose only of passing upon such proposition.

16. A will in possession of the proper county court for determination of its admissibility to probate, being a subject of an action *in rem* in such court, the thing is provable or disprovable according to law and as regards whether it is what it purports to be; if proponent and persons interested drop out the subject of the action remains to be dealt with, the court's sole function being to determine legality of execution and genuineness of testamentary declaration.

17. In general, all interested in trust property, if *sui juris*, may, by agreement, terminate the trust.

18. The rule last stated does not apply where any of the parties are under disability, or where the settler made known, expressly or plainly, his intention that such power should not exist.

19. Excluding merely nominal parties, all who have appeared in an action and are interested on the same side, though not necessarily on the same side of the record, constitute one party as

to making application for a change of venue, and must join to satisfy sec. 2625, Stats. (Supp. 1906: Laws of 1905, ch. 282).

20. In an appeal from a final order settling an executor's account, all persons adversely interested may be brought in and the proceedings organized as an equitable action to settle the dominant controversy and all others germane thereto; the persons appearing being arranged as plaintiffs or defendants according to their actual attitude, as near as practicable.

21. In the situation last stated persons who have wrongfully possessed themselves of portions of the trust fund may be brought in and appropriate redress afforded.

22. In case of probate proceedings had in due course for the distinct purpose of determining the amount to be allowed to an executor as counsel fees and an order being minuted on the court journal intended to finally close the matter, the right of appeal commences to run from that date.

23. The rule last stated does not apply to a presentment involving jurisdictional error or extra-judicial elements indicating that the determination was not a final judicial determination of the judicial questions or a mere preliminary determination to be followed by a final order.

24. A county court order entered on due presentation with opportunity for parties to be heard, and ordinary advisory orders as regards business management, of an estate, acted upon in good faith by an executor or administrator, protect such executor or administrator from personal liability.

25. Time for appealing from a final determination in county court, made in due course in the administration of an estate, dates from such determination whether embodied in a formal order or merely minuted upon the court journal.

26. A court memorandum, made in a hearing, on application for settlement of an executor's final account and preliminary to the final order, as to the amount to be allowed for attorneys' fees and compensation of guardians *ad litem*, does not set time running to appeal from an allowance in harmony therewith by such final order.

27. A contract between attorneys and representatives of persons not *sui juris* and others,—beneficiaries of a trust fund held by an executor,—requiring such attorneys to guard the fund against undue depletion, yet stipulating for such attorneys, compensation equal to the amount the court shall allow adversary attorneys, making it for the pecuniary interest of the former to have such amount placed high and their duty to have it placed as low as practicable, is contrary to public policy, not binding

on the beneficiaries, especially· those who are *sui juris*, and does not create any legitimate basis for the court to act upon.

28. If an executor acts, reasonably, and in good faith in the disbursement of money pursuant to an order of the supervising court within its jurisdiction to make, he is protected thereby from personal liability.

29. An executor who pays out trust funds pursuant to the court's direction outside the scope of any subject matter of such court's jurisdiction is personally responsible therefor.

30. Beneficiaries of a trust fund who by mistake as to their own rights or authority over such fund consent to improper disbursements therefrom to attorneys and guardian *ad litem* for past services, are not estopped from insisting upon a restoration of the fund; especially is that so as to beneficiaries who are not *sui juris* and represented by guardians having no right to stipulate away their rights.

31. If an executor, in good faith, disburses money of a trust fund pursuant to an order, bad for error, such order if seasonably and properly challenged, may be set aside or corrected so as to permit following the fund and recovering from the parties who received the money, but not so as to charge the executor personally.

32. Waiver does not require any consideration, lost or gained, to support it, but does require capacity on the part of the alleged waivor to give away his rights.

33. In the absence of bad faith, neither the doctrine of estoppel nor that of waiver applies to minors.

34. On a general appeal from the final judgment in the settlement of an estate in county court, the circuit court becomes possessed of the whole subject matter involved in such order and may make all persons parties necessary to a final settlement or who should be present for their due protection, and the issues cannot be so narrowed by pleading or consent as to interfere with judicial competency as to the parties under disability, to decide any matter required by the evidence to be decided to fully redress the dominant wrong and all others subsidiary or germane thereto.

35. Legitimate counsel fees for the executor in an administration matter are, in general, limited to fair compensation for services reasonably required to be done and actually performed, commonly done by one attorney, or firm of attorneys.

36. Attorneys for beneficiaries under a will who intervene and assist in the administration of an estate are not entitled to be paid for their services out of the trust fund, and representa-

tives of beneficiaries who are not *sui juris* have no authority
to stipulate to the contrary.

37. The duties of guardians *ad litem* in the settlement of an estate
are, in general, merely advisory and supervisory; they have
no authority to stipulate away any part of the trust fund, or
to intervene and do the work of the executors or their attor-
neys at the expense of the estate.

38. When this court, upon a reversal, can best promote justice by
giving such precise directions as to the proper judgment to be
rendered as will speedily terminate the litigation it will do so.

39. Where the whole history of an entire subject matter, including
a dominant feature and many others subsidiary or germane
thereto, in the entirety affecting many persons who are par-
ties, or may properly be made so, and the controversy, in gen-
eral, is opened by a reversal on appeal to this court, the
broad superintending control power, supplementing appellate
jurisdiction, affords the court ample opportunity to give the
full directions suggested in the last foregoing.

   [Syllabus by MARSHALL, J.]

*On motion for modification of mandate:*

40. The court having jurisdiction of supervising a trust may pro-
vide for payment out of the trust fund for reasonable expenses
in protecting the trust.

41. Reasonable attorneys' fees for services actually and rightfully
rendered, doing that which is reasonably necessary in con-
serving a trust estate, are allowable to the trustee as expenses,
and may be allowed direct to the attorney, chargeable to the
trust fund; and such services may be so compensated when,
from the necessities of the case, they are rendered at the re-
quest of the *cestuis que trust* acting in place of the trustee.

42. The amount of the compensation to be allowed in such cases is
always within the discretion of the court, not controlled by
contract, and should be determined with reference to the rea-
sonable necessity for the services, the amount and nature
thereof and the extent of the resulting benefits, and should be
fixed upon the basis of compensation for somewhat similar
services in official life, rather than the customary charges as
between attorney and client.

43. Ordinarily the supreme court will not go further than to fix the
compensation for services rendered on appeal, leaving the
court below to deal with the matter of services rendered there;
but in extraordinary cases the higher court may cover the en-
tire field, terminating the litigation in all respects.

APPEALS from a judgment of the circuit court for Wauke-sha county: MARTIN L. LUECK, Circuit Judge. *Reversed as to one appeal. Appellants as to the others to take nothing thereby; but, pay costs.*

In January, 1905, and at the time of his death in 1906, John A. Rice possessed a fortune around $175,000 in value. He had a daughter, *May R. Cowie,* and three grandchildren by her,—*May R. Cowie,* referred to in the will as *Pussie Cowie, Lloyd R. Cowie,* sometimes referred to as *Beebe Cowie,* and *Gordon Cowie;* also a son and three grandchildren by him,—*Lulu C. Rice, Rhea Frances Rice,* and *Magdalena Grace Rice.* At the time of the proceedings hereafter men-tioned the son had deceased leaving a widow, *Delia Rice.* The grandchildren, when such proceedings occurred, were minors, except *Lulu C. Rice, Rhea Frances Rice,* and *Gordon Cowie.* In due time, *Delia Rice* was appointed general guardian for *Magdalena Grace Rice,* and *Henry Lockney* was appointed her guardian *ad litem. May R. Cowie* was ap-pointed general guardian for her minor daughter *May R. Cowie,* referred to sometimes as *Pussie Cowie,* and her minor son *Lloyd A. Cowie,* sometimes referred to as *Beebe Cowie,* and *G. Holmes Daubner* was appointed their guardian *ad litem.*

Mr. Rice died testate in Waukesha county, August 18, 1906. His will was dated January 9, 1905, and, omitting the introductory and attesting parts, is as follows:

## "FIRST.

"I give and bequeath to *Geo. W. Strohmeyer* and *Libbie Allerdice,* the first being the president of the Milwaukee Na-tional Bank, and the second my faithful housekeeper for many years, all the estate both real and personal of which I may be possessed at the time of my death.

"To be held in trust for the uses and purposes hereinafter named—and they shall not be required to give any bonds or to file any schedule of my said estate. To buy and sell, to invest and re-invest any and all monies, stock, and bonds

which may belong to my estate, and in case of the death of one of said trustees the other may appoint, with the advice of the court, a successor who shall have the same authority as the deceased trustee, and that no inventory of my estate be filed in any public office.

## "SECOND.

"It is my will that in case my daughter *May R. Cowie* is left a widow during the life of this trust she shall receive from my estate the annual sum of five hundred dollars, and at the expiration thereof if a widow to receive the sum of two thousand dollars.

## "THIRD.

"I give and bequeath to my son Frank Rice the annual sum of two hundred dollars to be paid out of the income of my estate during his natural life and also such books from my library as he may select.

## "FOURTH.

"My grandson *Beebe Cowie* shall receive the annual sum of one hundred dollars for the term of five years after my death, to be paid out of the income of my estate by the said trustees.

## "FIFTH.

"I give and bequeath to my granddaughter *Lulu Rice* the annual sum of two hundred dollars, and to the other two daughters of Frank Rice and sisters of the said *Lulu Rice* the annual sum of one hundred dollars.

## "SIXTH.

"I request and direct that my said trustees erect a family monument of granite, on which shall be inscribed my name with date of birth, together with the names of my deceased wife, Caroline I. Rice, and my son William A. Rice, May Rice, and Jackie Cowie, and direct them to expend in said monument a sum not to exceed four thousand dollars.

## "SEVENTH.

"It is my will that my said trustees keep all the residue of my estate invested in the best possible manner until the death of my son Frank Rice, when this trust shall cease unless he should die before the youngest grandchild named above reaches the age of thirty years, and upon his death, or when the youngest grandchild reaches the age of thirty years, then

all the remaining residue of my estate shall be equally divided among the three children of my son Frank Rice. To make this plain, this trust shall continue in any event until the youngest grandchild reaches the age of thirty years.

### "EIGHTH.

"It is my will that all my just debts be paid with as little delay as possible at this time. My debts are very few if any. It is also my desire that my funeral be as quiet and unostentatious as possible.

"And lastly, setting forth the reasons which have governed me in the disposition of my estate, a matter which has given me great concern, my son Frank Rice has never manifested a disposition or capacity either to earn money or take care of it. I therefore feel a bequest to him outright would not be for his best interest, and in the case of my only other child, *May R. Cowie,* well beloved by me, she is now the wife of a man who has always had a seemingly hypnotic control over her will, many times to her absolute detriment, and so far as I have observed after an acquaintance of many years, he has never been able to give her a home or a decent living, and I have advanced large sums of money to pay debts and enable him to live, furnishing her a home, and she now has a life lease of the home she occupies, besides I have been put to great expense and trouble through the actions of her husband, and I here declare that I do not owe either my daughter or her husband, F. G. Cowie, any money for any purpose whatever, and I further declare that I have been acquainted with *Geo. W. Strohmeyer* and *Libbie Allerdice,* my said trustees, for over thirty years. They are well acquainted with my business, and I have the utmost confidence in their ability and integrity."

January 5, 1906, by a codicil No. 1, he made the following changes in articles Four and Seven of the will:

"It is my will that the annual allowance of one hundred dollars to *Beebe Cowie* be increased to a sum sufficient to enable him to complete his education, said sum to be determined by my said trustees, but not to exceed four hundred dollars annually, and at the termination of this trust he is to share equally in the residue of the estate with the children of my

son Frank Rice, and in case of the death of any of said children he is to receive the share of said deceased child. *Beebe Cowie* is also to have such books from my library as he may select at termination of trust, and in case of the death of my son Frank Rice he is to have all the books in my library. I also give him my watch which I have carried for fifty years. It is also my will that my granddaughter *Pussie Cowie* have the piano, to be given her at my death."

On the 30th day of June, 1906, by codicil No. 2 he made a further change, which, so far as need be shown now, is indicated by the following:

"1st. It is my intention that all annuities provided for in my will shall terminate when the trust shall terminate and the estate is to be distributed by the trustees unless a shorter period is specifically named.

"2nd. The interlineations in the seventh and ninth lines of codicil No. 1, which are very material, were inserted before said codicil was executed by me.

"3rd. It is my intent and will, that in determining the period when the trust shall terminate, that the age of any grandchild, whether a child of my son or of my daughter for whom some provision is made in my will, or in the codicils thereto, shall be taken into consideration, and the trust shall terminate when the youngest of said grandchildren shall have attained the age of thirty years, provided only that if my son Frank shall still be living at that time the trust shall continue to the time of his death as provided in the will as originally drawn.

"4th. I do give and bequeath to my granddaughter, *Pussie Cowie,* daughter of my daughter *May R. Cowie,* a semi-annual allowance of one hundred dollars, to aid in her support and education for the term of five years from the time of my death, when the same shall terminate, and at the expiration of the trust she shall receive the sum of two thousand dollars.

"5th. I do hereby re-affirm and re-execute my foregoing will as originally drawn and codicil No. 1 added thereto as modified and changed by this codicil, and the same together with this codicil construed as a whole shall constitute my last will and testament."

By a codicil No. 3, dated July 15, 1906, this further change was made:

"It is my will that in case my grandson, *Beebe Cowie,* shall die before the termination of the trust period provided for by my foregoing will, the share of my estate which would be coming to him had he survived until the termination of the trust shall go and belong to his brother *Gordon Cowie* and his sister *Pussie Cowie,* share and share alike—and in case either of them shall not be living at the time of the termination of the trust the survivor shall take the whole—the same to be paid at the time of the termination of the trust.

"In case my granddaughter *Pussie Cowie* shall die before the termination of the trust period, then the share of my estate given her by my will—except what is given her by this codicil which is disposed of in the event of her death—shall go and belong to her mother, to be paid her as her heirs or assigns at the time of the termination of the trust."

August 5th thereafter codicil No. 4 was added as follows:

"First. I hereby give, devise, and bequeath unto Hartland Lodge No. 122, Free and Accepted Masons, of the village of Hartland, Wisconsin, the sum of one thousand dollars, to be paid to said legatee at the end of five years from my decease, and sooner if needed by said legatee, said payment to be made by the trustees named in said will, and to be kept by said legatee in a building fund, separate from the general funds of said lodge, and expended only in the erection of a Masonic temple or hall building to be used for Masonic purposes by said Hartland Lodge No. 122, Free and Accepted Masons.

"Second. I hereby ratify and confirm the foregoing will and all the codicils thereto preceding this, in every particular except as the same is modified by the preceding paragraph of this codicil."

In due course the will was presented for probate and the hearing in respect thereto brought on, the infants being represented by their guardians *ad litem,* Connell & Weidner, attorneys appearing for the proposing executrix *Libbie Allerdice,* Nath. Pereles & Sons appearing for the proposing executor *George W. Strohmeyer,* and Ryan, Merton & Newbury for

the adult beneficiaries, *May. R. Cowie, Lulu C. Rice,* and
*Rhea Frances Rice.*

The adults filed objections to allowance of the purported
will. A hearing was had in respect thereto October 23, 1906,
very little evidence other than ordinary proof of execution of
the will being taken. Some arguments were made, princi-
pally by Mr. Ryan, representing the objectors, the whole
matter so far as proceedings in court is concerned being con-
cluded and the will admitted to probate in one day. Letters
testamentary were seasonably issued, and, December 13th
thereafter, the contestants appealed to the circuit court for
Waukesha county. Soon thereafter, by agreement, the exec-
utors were permitted to proceed with the business of admin-
istering the estate pending the appeal, it being understood
that the hearing on claims would be postponed till return of
the record from the appellate court.

On the appeal, there was no contest nor time spent in court
in respect to the matter, except a part of one day, and no sug-
gestion was made to the court that the will was invalid or that
there was any evidence producible to support the contest.
Practically the whole matter was determined by negotiations
out of court, resulting in an agreement by which it was at-
tempted to bind all parties interested, if approval by the
court could be secured, changing the disposition of the estate
of the testator in substantially all material particulars. The
agreement was reduced to writing and formally signed by all
adult beneficiaries, by the general guardians, the guardians *ad
litem,* executors, and attorneys for them and for the adults.
It contained a stipulation as to attorneys and guardians *ad
litem* fees aggregating $20,000. The several amounts were
left blank when the paper was signed by at least some of the
parties. Such amounts were settled upon by such attorneys
and guardians *ad litem* without much or any consultation
with the parties they represented or with the court. The
instrument was in such form that *Mr. Daubner* was required

to sign separately for *May R.* (*Pussie*) *Cowie* and *Lloyd R.* (*Beebe*) *Cowie.* After signing once he refused to complete the matter except upon being paid by the mother of his wards a large amount in addition to that stipulated for in the agreement. He was prevailed upon by the other attorneys to accept from *Mrs. Cowie* a much less sum than the extra he first demanded. He finally obtained $1,000 from *Mrs. Cowie* as a condition of his joining in the agreement so as to make it effective, as the parties supposed. He made some claim that *Mrs. Cowie* was justly indebted to him as an excuse for making the demand for extra pay. The fact remained that he exacted a large amount of money from *Mrs. Cowie* as a condition of performing what was his duty to his wards if that required him to sign the agreement or in any way become a party to it. Such agreement, in fact, as *Mr. Daubner* claimed, was largely the work of himself and Mr. Ryan. Complaint was later made in the county court against *Mr. Daubner* because of his aforesaid conduct, in proceedings instituted to terminate his authority as guardian *ad litem.* Thereupon he resigned and the resignation was accepted, no further proceedings being taken against him. After such resignation was accepted *Mr. Henry Lockney* was appointed guardian *ad litem* for the minors previously represented by *Mr. Daubner.*

The agreement was presented to the circuit court as a basis for concluding the proceedings on appeal and, omitting the execution clause, is as follows:

"Whereas, John A. Rice died in the town of Merton, Waukesha county, Wisconsin, on the 18th·day of August, A. D. 1906, testate; and

"Whereas, the said John A. Rice left him surviving no widow, but left the following children and grandchildren as heirs at law and next of kin: *May R. Cowie,* who was the only surviving child of said John A. Rice at the time of his death, and *Lulu C. Rice, Rhea Frances Rice,* and *Magdalena Rice,* grandchildren, they being the children of Frank Rice,

who was the son of John A. Rice, deceased; the said *Lulu C. Rice* and *Rhea Frances Rice* being of full age, the said *Magdalena Grace Rice* being a minor over fourteen (14) years of age; and

"Whereas, the said John A. Rice left a last will and testament wherein *George W. Strohmeyer* and *Libbie Allerdice* are named as the executors of said will, also as trustees of the trust created by the terms of said will; and application for the admission of said will to probate having been made in the manner provided by law, the said executors appearing in person and by their attorneys, Messrs. Nath. Pereles & Sons appearing for *George W. Strohmeyer,* and Messrs. Connell & Weidner appearing for executrix *Libbie Allerdice; May R. Cowie* appearing through her attorneys, Messrs. Ryan, Merton & Newbury; *Henry Lockney, Esq.,* the duly appointed guardian *ad litem,* appearing for *Rhea Frances Rice,* then a minor, now an adult, and *Magdalena Grace Rice,* a minor; *G. Holmes Daubner, Esq.,* the duly appointed guardian *ad litem* for *Lloyd Cowie* and *May R. Cowie,* minors, and special legatees under said will; *Lulu C. Rice,* an adult, appearing by Messrs. Ryan, Merton & Newbury, her attorneys; and

"Whereas, further, *May R. Cowie, Lulu C. Rice, Rhea Frances Rice* appeared by their attorneys, Messrs. Ryan, Merton & Newbury, and filed objections to the admission of said will and the codicils, they being four in number, setting forth the grounds of objection, and hearing having been had before the county court of said Waukesha county, Wisconsin; and the same having come on to be heard on the 23d day of October, A. D. 1906; and the court, after being fully advised in the premises, having admitted said will, together with the four codicils, to probate by order of said county court on the 23d day of October, A. D. 1906; and

"Whereas, *May R. Cowie, Lulu C. Rice,* and *Rhea Frances Rice,* then of age, feeling themselves aggrieved and being parties in interest, filed their appeal from the order of said county court admitting said will and codicils to probate within the time prescribed by law to the circuit court of Waukesha county, in the manner provided by law; and

"Whereas, said appeal came on for trial in the circuit court at the May, 1907, term of said court, and is yet pending be-

fore said court, being adjourned from time to time by the consent of all the parties; and said trial upon said appeal being now set for the 12th day of September, A. D. 1907, or as soon thereafter as same can be heard before said circuit court of Waukesha county; and

"Whereas, it appears that the said *May R. Cowie,* daughter of said John A. Rice, deceased, has filed a claim against the estate of said John A. Rice, deceased, in the sum of twelve thousand five hundred ($12,500) dollars; and

"Whereas, all the parties interested in any way in the said matters, after due consultation and consideration of all the facts, circumstances, and law surrounding the case and applicable thereto; and believing it to be for the best interest of the estate and all parties interested therein; and for the purpose of avoiding further litigation; and for the settlement of the present litigation for the contest over the last will and testament of the said John A. Rice, deceased; and to save what necessarily would be great expense in connection with the litigation that would follow the further prosecution of the contest involved in the appeal pending before said circuit court of Waukesha county, have agreed upon the following settlement of the same, and hereby submit said settlement to the said circuit court of Waukesha county, and ask that the same be approved by said court:

## "TERMS OF SETTLEMENT.

### "I.

"That the order of the county court of Waukesha county, admitting the last will and testament of John A. Rice, deceased, together with the codicils attached, being four in number, and from which order appeal was taken to said circuit court of Waukesha county, be affirmed;

### "II.

"That the estate of John A. Rice, deceased, be distributed by the county court of Waukesha county when the time arrives in the course of settlement of said estate in county court of Waukesha county, for making such order of distribution after the payment of all claims allowed and directed to be paid by the executors against said estate, in the manner provided by law, and the one thousand dollars ($1,000) legacy to Hartland Lodge, Free and Accepted Masons, of village of

Hartland; also, all expenses connected with the probating of said estate and directed to be paid out of said estate, also the expenses including attorneys' fees and guardian *ad litem* fees, as hereinafter stated in connection with the appeal pending in circuit court of Waukesha county, as follows:

"The sum of five thousand dollars to Nath. Pereles & Sons, as attorneys for executor *George W. Strohmeyer,* for services performed in said circuit court in connection with said litigation; the sum of five thousand dollars to Messrs. Connell & Weidner, attorneys for executrix *Libbie Allerdice;* also the sum of twenty-five hundred dollars to *G. Holmes Daubner,* guardian *ad litem* for *Lloyd Cowie* and *May R. Cowie,* minors, interested in said litigation, and also the sum of twenty-five hundred dollars to *Henry Lockney,* guardian *ad litem* for *Magdalena Grace Rice,* a minor interested in said litigation; also the sum of five thousand dollars to Messrs. Ryan, Merton & Newbury, attorneys for *May R. Cowie, Lulu C. Rice,* and *Rhea Frances Rice,* for services performed in connection with the litigation in the circuit court of Waukesha county, and that said amounts aforesaid for expenses and attorneys' fees and guardian *ad litem* fees allowed by the circuit court be paid by the executors out of the *corpus* of the estate of said John A. Rice within ten days from the entry of this order.

"III.

"That the legacy bequeathed by the fourth codicil to the will of said John A. Rice of the sum of $1,000 to the Hartland Lodge 122, Free and Accepted Masons, of the village of Hartland, Wisconsin, be paid to said legatees by the executors of the said will of John A. Rice on or before the final settlement of the account of said executors, to be kept by said legatee in a building fund, separate from the general funds of said lodge, to be expended only in the erection of a Masonic temple or hall building for Hartland Lodge No. 122, Free and Accepted Masons.

"IV.

"That the legacy bequeathed to *May R. Cowie,* referred to as *'Pussie' Cowie* in paragraph 4, codicil No. 2, of $2,000, to be held in trust by the trustees named in the will, or their successors, for *May R. Cowie,* and the income thereon paid to the general guardian of said *May R. Cowie* during her

minority for the use and benefit of said *May R. Cowie* and, after reaching her majority, to herself for her use and benefit until the termination of the trust, and at the termination of the trust the sum of $2,000 shall be paid to said *May R. Cowie,* and in case of her death before the termination of said trust, then to her heirs or assigns, or as she may have directed prior to her death.     This provision in behalf of said *May R. Cowie* being in lieu of paragraph 4 of said codicil to the will of said John A. Rice.     The said *May R. Cowie,* known as *'Pussie,'* shall have the piano referred to in paragraph 1 of codicil 1 to the last will and testament, also $100 a year for the term of five years from the date of the death of John A. Rice, August 18, 1906, to be paid to her by the guardian of *Lloyd Cowie* during his, *Lloyd Cowie's* minority, and by himself after his majority until the five payments herein provided for are made.

"V.

"That in lieu of the provisions made in the last will and testament of John A. Rice, deceased, in favor of *Lloyd Cowie,* referred to in the will as *'Beebe,'* the said *Lloyd Cowie,* his heirs and assigns, shall take and receive from the estate of his said grandfather, John A. Rice, an undivided one-fourth of all said estate in fee simple for his own use and benefit, both real and personal, after the payment of expenses, legacies, etc., herein provided for, subject to be held in trust, however, by the trustees named in the will, or their successors, for the same time and term as provided in the will.     The accumulated interest of said undivided one-fourth on said one-fourth interest in said estate shall be paid, together with the income thereafter accumulating, semi-annually to the general guardian of said *Lloyd Cowie* on the 2d day of January and the 1st day of July, of each year, during the term of said trust, and after said *Lloyd Cowie* attains his majority, then said income is to be paid to him in person.     The said *Lloyd Cowie,* however, shall also take all of the books in the library of his deceased grandfather, John A. Rice, as provided in codicil No. 1 of the last will and testament of said John A. Rice, and to have the privilege of taking said books at once.     He shall also have the watch referred to in said codicil No. 1, Frank Rice, the son of John A. Rice, having died before the death of said John A. Rice.     The said *Lloyd Cowie* shall pay,

however, through his general guardian during his minority and by himself after he attains majority, to *May R. Cowie* the sum of $100 per year for the term of five years, to be paid on the 2d day of January each year, and the further sum of $100 to his brother *Gordon Cowie,* for the term of five years, to be paid on the 2d day of January of each year, through his general guardian during his minority and by himself after he attains his majority.

"VI.

"That *Gordon Cowie,* in lieu of any interest contingent, or otherwise, that he may have under said last will and testament, shall receive from his brother *Lloyd Cowie,* to be paid out of the income that said *Lloyd Cowie* will receive from said estate, $100 a year, to be paid to him annually for five years on the 2d day of January in each year, the first payment to be made January 2, 1908, and said annuity to be paid by the general guardian of said *Lloyd Cowie* during his minority and by himself after he attains his majority, until the sum of $500 has been paid.

"VII.

"That the said *May R. Cowie,* the only living child of said John A. Rice, deceased, shall receive from the executors of the will of said John A. Rice, deceased, within ten days from the date hereof, or as soon thereafter as convenient for the executors to pay it, the sum of five thousand dollars ($5,000) cash, for the purpose of paying her debts and meeting her immediate necessities, and she shall take and receive from the estate of her father, John A. Rice, deceased, an undivided one-fourth of all the real estate and personal property of said estate in fee simple, to have and to hold forever, less the sum of five thousand dollars ($5,000), and also such sum at the final settlement of the estate as she and her attorneys shall agree upon as reasonable and just as attorneys' fees, and which sum, when agreed upon, shall be paid by the executors to her attorneys in her behalf for their services in the county court of Waukesha county, and the remainder of said undivided one-fourth, after deducting such sums as hereinbefore are provided to be paid out of said estate, shall remain in trust for the time and term provided in the will. She, the said *May R. Cowie,* to receive all the income accumulated and to be accumulated upon her said one-fourth interest, to be

paid to her by said trustees semi-annually on the 2d day of January and the 1st day of July of each year during the term of said trust, and afterwards to her or her legal representatives in person. The claim of said *May R. Cowie* for $12,500 to be disallowed by the county court and the judgment to be final.

"VIII.

"That in lieu of the provisions made in the will of said John A. Rice for *Lulu C. Rice, Rhea Frances Rice,* and *Magdalena Grace Rice,* children of Frank Rice, son of John A. Rice, deceased, they shall receive each an undivided one-sixth of said estate in fee simple for their own use and benefit, and they shall receive from the executors of the last will and testament of said John A. Rice, within ten days after the date hereof, or as soon as it is convenient for the executors to pay the same, the sum of $1,000 each, said sum to be deducted from each of their proportionate shares. The $1,000 coming under this provision to *Magdalena Grace Rice,* a minor, shall be paid to her general guardian. *Lulu C. Rice* and *Rhea Frances Rice* shall also receive such sum out of their proportionate shares at the settlement of the estate in the county court and before the said estate shall pass into the hands of trustees, for attorneys' fees, as they and their attorneys shall agree upon, and when the amount is agreed upon, the said executor shall pay their attorneys such amount. The balance of their undivided one-sixth each shall then remain in trust for the time and term provided in the last will and testament of said John A. Rice. They shall each, however, receive from the trustees all of the accumulated income of their shares of said estate and the income which will hereafter accumulate and which shall be paid to the said *Lulu C. Rice* and *Rhea Frances Rice* in person and to *Magdalena Grace Rice* through her general guardian during her minority and to herself after she attains her majority, semi-annually on the 2d day of January and 1st day of July of each year.

"IX.

"That the said county court of Waukesha county shall distribute said estate, when the same is ready for distribution in the due course of law, in accordance with the terms of this agreement of settlement and in accordance with the terms of said last will and testament, together with the four codicils

thereto attached, where the same does not conflict with this agreement, and that the said' county court shall allow such compensation to the executors named in said last will and testament as is provided by law, including a reasonable allowance for attorneys' fees and guardian *ad litem* fees for services performed in settlement of said estate." .

When such agreement was presented to the court, the appeal was taken up for disposition on an order to show cause obtained by Ryan, Merton & Newbury.  Mr. Ryan stated to the court, as reasons for changing Mr. Rice's scheme, that it was complicated and difficult to carry out; that it tied up the estate so it would not vest in any one for a long time and would be useless to some interested; that his firm had labored for a long time to arrange a different disposition of the estate by settlement, consulting with attorneys for the executors, with the guardians *ad litem* and all interested; that executor *Strohmeyer,* with whom the will was entrusted by Mr. Rice, testified that he assured the testator that it would be sustained; but that he had concluded to submit to the court whether the agreed plan, which had been arranged and signed by or on behalf of all parties interested, should not take the place of the testamentary scheme, and that all the parties interested were present, or represented, and asked for approval of the agreement.

*Mr. Pereles* of the firm of Nath. Pereles & Sons announced that he represented *Mr. Strohmeyer* and *Mr. Connell* represented *Miss Allerdice;* that they had filed an answer merely representing their desire to perform their duty in presenting such evidence to sustain the will as they could produce in case a settlement was entered into and to do their share toward administering the estate; that they had no other interest in the controversy; that he believed the plan agreed upon was equitable; that he was desirous of preventing litigation; that he had something to do in aiding Mr. Rice to prepare the codicils and recommended the change as contem-

plated; that the executor thought he had no right to interfere with any settlement the parties might agree upon among themselves, but desired and expected to be protected by order of the court.

Mr. Cowie, *Mrs. Rice,* the guardian *ad litem,* and the beneficiaries testified to this general effect: Each knew the contents of the agreement, the change from the testator's scheme, and agreed thereto. Such scheme was not satisfactory, particularly to *Mrs. Cowie* and *Mrs. Rice.* No one of either the Cowie family or the Rice family possessed any property. Both families needed the benefits securable from the estate for their maintenance. *Mrs. Cowie* was in debt and needed immediate assistance for herself and family. The same was true of *Mrs. Rice.* The trust, by the terms of the will, would be of such long duration that the grandchildren, particularly on the Rice side, would not be likely to survive it, the period being some fifteen years. All joined in requesting the disposition of the estate under the agreement instead of under the plan devised by Mr. Rice.

The evidence having closed without any reference having been made to the stipulated compensation for fees of attorneys for the executors and guardians *ad litem,* the court remarked, in effect, that no such proof was desired, as the parties and attorneys who knew the facts had agreed upon the matter.

Judgment was rendered in due form, specifically confirming the admission of the will to probate, approving of the stipulated changes in the testator's disposition of his property, passing favorably upon the reasonableness of the agreement as to attorneys and guardians *ad litem* fees, and directing that such approved agreement instead of the will should be the basis for settling and distributing the estate.

In due course, after entry of such judgment, the hearing on claims was taken up in county court, all parties interested being represented as in the circuit court, except *Mr. Lockney,*

who had been substituted, as before indicated, as guardian ad litem in place of Mr. Daubner.

In respect to subsequent proceedings in county court, after substantially all services had been performed, a written agreement was made by Ryan, Merton & Newbury, attorneys on the one side, and all the beneficiaries on the other, the minors acting by their general guardians, that the former should have the same compensation for services rendered in settling the estate as might be allowed to attorneys representing the executors, payable out of the corpus of the property and chargeable to the beneficiaries according to their respective interests.

In county court, subsequent to the judgment, objections to claims filed, proceedings in respect thereto, and the distribution of the estate as agreed upon, were looked after, largely, by attorneys for the beneficiaries and attorneys for the executor and the guardians ad litem jointly.

There was one appeal to the circuit court, that being by the husband of Mrs. Cowie, who filed a large claim. It was allowed in the circuit court by agreement at somewhat less than fifty per cent. There were other claims, reduced, withdrawn, or disallowed, including one in favor of Mrs. Cowie which was dropped in consideration of the provision made for her in the circuit court agreement. Aside from the claim of Mr. Cowie, the amount the estate was found to be indebted, directly, was small.

There were fourteen allowed claims, thirteen of which aggregated $6,745.46, one being Mr. Cowie's of $3,277.08 and one $2,714.83 to the Bank of Manitowoc, leaving $753.55 for the aggregate of eleven claims. The remaining claim, allowed at $48,284.80, was a note owned by the Milwaukee National Bank, of which Mr. Strohmeyer was president. It was made by the Ideal Land & Investment Company, a corporation of which Mr. Rice was virtually the owner, and indorsed by him. It was carried by the bank as the note of

the corporation and was collectible as such.  It was produced by *Mr. Strohmeyer* as evidencing a debt of Mr. Rice. Formal proof thereof was made by the attorneys for executor *Strohmeyer.*  Objection was made by the attorneys for some of the beneficiaries against its allowance upon the ground that it was not a proper charge against the estate, though there was no particular contest.  It was finally allowed without opposition by the attorneys for the executors under the mistaken notion that it had been treated between the bank and Mr. Rice as his note, otherwise the evidence tended to show, there would have been a question before the county court whether it was a legitimate claim against the estate, though the evidence also tended to show that, in the ultimate, the estate was not thereby prejudiced as the debt, whether of Mr. Rice or his corporation, would, either directly or indirectly, have come out of the estate.

Executrix *Libbie Allerdice* did not personally perform any service of moment in the settlement of the estate though she was represented by attorneys Connell & Weidner from the beginning to the end.  Executor *George W. Strohmeyer* performed substantially all the work which was performed by the executors, he being represented from the beginning by attorneys Nath. Pereles & Sons.  *Henry Lockney* as guardian *ad litem* represented all minor heirs, except during the time *Mr. Daubner* represented a part of them, and Ryan, Merton & Newbury represented the adults, *Mrs. May R. Cowie, Lulu C. Rice, Rhea F. Rice, Mrs. Rice,* and *Gordon R. Cowie.*

There were court proceedings in the hearing on claims on some eight days and in the settlement of the executors' account on some two different days.  The entire proceedings in the settlement of the estate were not attended with any serious difficulty or any unusual amount of labor, except as it was complicated by the negotiations to secure the substitute disposition of the estate, the success of such negotiations, and the numerous attorneys representing different interests, all of

whom participated in performing labor within the scope of the duty of the executors and their attorneys.

The final order settling the executors' account and assigning the estate was made January 8, 1909. The total estate charged to the executor for principal and accumulations was $187,087.09. The total credits allowed was $106,606.35, leaving a balance of $80,455.74, which included some undistributed income. The result, indicated, was reached after deducting $5,000 advanced to *Mrs. Cowie* out of her share in the *corpus,* $1,000 each advanced to *Lulu C. Rice, Rhea F. Rice,* and *Magdalena Grace Rice;* aggregating in all $8,000, pursuant to the circuit court agreement; $20,000 paid to guardians *ad litem* and attorneys pursuant to such agreement, $9,210.57 distributed as income under such agreement, less $662.80 thereof paid for inheritance taxes and $147.77 allowed for executors' percentage, and $10,040 allowed to attorneys and guardians *ad litem* in county court.

Of the residue, $5,566.35 was claimed, allowed, and distributed as income under the agreement, leaving $74,891.39 net *corpus* to be turned over to the trustee for administration as such by the trustee under the circuit court agreement, $1,000 of which was set aside for the Hartland Lodge and $4,000 for a family monument.

The total for distribution as per terms of the will, according to the statement in the adjusted final account—treating credits for administrative expenses, less deductions made on appeal to the circuit court, and items of allowed claims as proper, and adding interest on income disbursed under the agreement, in excess of interest on payments to beneficiaries as per the terms of the will, is as follows:

Total estate, principal and income.................... $187,084 09
Interest on depletions of the estate pursuant to changes
  in the testator's scheme in circuit court, less interest on
  payments authorized by the will computed from time
  of payments in each case to the date of adjustment of
  the final account as near as the same can be deter-
  mined from the record, was......................... 2,912 50

Total debits............................................ $189,996 59

| | | |
|---|---:|---:|
| Paid on allowed claims...................... | $55,030 26 | |
| Allowance for attorneys for executors, services of guardians *ad litem*, and other expense items, including transfer tax....... | 8,462 45 | |
| Allowable credits under will to | | |
| Lloyd (Beebe) Cowie.................. | 949 66 | |
| Same to May R. (Pussie) Cowie........ | 514 99 | |
| "    " Lulu C. Rice................... | 200 00 | |
| "    " Magdalena Grace Rice.......... | 257 49 | |
| "    " Rhea Frances Rice............. | 257 49 | |
| Total credits............................ | | $65,672 34 |
| Balance ........................................ | | $124,324 25 |

Taking account of the advances made to *Mrs. Cowie* and the *Rice* children under the agreement, aggregating $8,000, to be charged to their share of the *corpus,* the residue of $74,891.39 for administration under the trust, as modified by the agreement, was distributable as follows under such agreement:

| | |
|---|---:|
| Family monument.............................. | $4,000 00 |
| Hartland Masonic Lodge........................ | 1,000 00 |
| Mrs. May R. Cowie............................. | 13,972 86 |
| Lloyd (Beebe) Cowie........................... | 18,972 85 |
| Lulu C. Rice.................................. | 11,648 56 |
| Magdalena Grace Rice......................... | 11,648 56 |
| Rhea Frances Rice............................ | 11,648 56 |
| May R. (Pussie) Cowie......................... | 2,000 00 |
| | $74,891 39 |

The $124,324.25, according to the record as before indicated, at the date of the final settlement, January 8, 1909, computed according to the will, had the estate been settled and transferred to the trustees as contemplated thereby, would have been represented by the following interests:

| | |
|---|---:|
| Hartland Lodge............................... | $1,000 00 |
| Family monument............................. | 4,000 00 |
| Lloyd (Beebe) Cowie......................... | 29,831 06⅔ |
| Lulu C. Rice................................. | 29,831 06⅔ |
| Magdalena Grace Rice........................ | 29,831 06⅔ |
| Rhea Frances Rice........................... | 29,831 06⅔ |
| | $124,324 25 |

The same and the income therefrom to go accordingly, subject to payment of $500 per year to *May R. Cowie,* in case of

her becoming a widow, during the remainder of the trust period, not exceeding $400 per year for the five years subsequent to the decease of Mr. Rice to *Lloyd (Beebe) Cowie,* $100 semi-annually to *May R. (Pussie) Cowie,* during the same period, $200 to *Lulu C. Rice,* $100 per year to *Magdalena Grace Rice,* the same to *Rhea Frances Rice* at the termination of the trust period, $2,000 to *May R. (Pussie) Cowie* at such termination, $2,000 to *May R. Cowie,* in case of her then being a widow, and subject to the right of *Lloyd (Beebe) Cowie* to take in place of any of the *Rice* children not surviving the trust, subject to the right of *Gordon Cowie* and *May R. (Pussie)* to succeed to his rights in case of his not so surviving and with like right of survivorship between them in case of only one being alive at the termination of the trust and their brother *Lloyd* predeceasing.

The estate, as so adjusted in the county court, was by the final order, in due form, assigned to *Henry Lockney* as trustee to be administered according to the substitute trust and such directions as the county court might subsequently make as to principal and income.

From the final order *May R. Cowie,* for herself and as general guardian of *Lloyd (Beebe) Cowie, May R. (Pussie) Cowie,* and *Delia Rice,* as general guardian of *Magdalena Grace Rice, Lulu C. Rice,* and *Rhea F. Rice,* joined in appealing to the circuit court from the whole thereof, except that part accepting the resignation of *George W. Strohmeyer* and *Libbie Allerdice* as trustees and appointing *Henry Lockney* in their place.

Such proceedings were thereafter duly had that the appeal in circuit court was organized as an action therein, with the appellants as plaintiffs, to test the order appealed from as to all matters involved either by the notice of appeal or order of the appellate court. The following were made defendants and duly brought into the litigation: *George W. Strohmeyer,* executor, *Libbie Allerdice,* executrix, *G. Holmes*

*Daubner,* T. E. Ryan, *Ernst Merton,* and *Charles W. New-bury* as firm of Ryan, Merton & Newbury, *Thomas J. Pere-les, Nathan Pereles, Jr.,* and *Emil G. Rahr* as firm of Nath. Pereles & Sons, *Samuel A. Connell* and *Adolph J. Weidner* as firm of Connell & Weidner, *Henry Lockney,* and *Thomas J. Pereles* and *James W. Pereles* as personal representatives of James M. Pereles, deceased.

Issues were framed concerning all matters of difference covered by the findings hereafter referred to and in respect to the proceedings in the will contest. The court excluded all evidence respecting such proceedings, particularly as to the allowance of $20,000 for attorneys and guardians *ad litem* fees for services in the circuit court in the will contest appeal, according to the judgment of such court—upon the theory that such judgment was conclusive in respect to all matters covered by it, though the amounts so allowed were considered on the question of whether those allowed in the county court were excessive.

Evidence, in general, by each of the parties concerned in the settlement of the estate in county court as to services therein was received, and, incidentally, as to what occurred in the will contest in circuit court, though all evidence supposed to impeach the result there, was, on objection, rejected.

The evidence indicated or tended to show that one attorney, or one firm of attorneys, could well have protected the interests of the estate in county court, especially under the oversight of competent guardians *ad litem* acting with full appreciation of their duties; that guardians *ad litem* and attorneys for adult beneficiaries occupied, as to some important matters, double and inconsistent positions; that, as before indicated, instead of guardians *ad litem* and attorneys for adult beneficiaries looking, solely, after the interests they represented by seeing that the executors and their attorneys performed their duties, they interfered, by invitation or permission, and did the work themselves, and aside from the in-

terferences and complications involved in the successful attempt to supersede the testator's will, the settlement of the estate was not attended with any special difficulty; that the excuse for two sets of attorneys for the executors was an impression, on the part of *Miss Allerdice,* that the personal interests of her co-executor were in conflict with his duties to the estate, though the county court was not informed thereof in allowing compensation for two sets of attorneys, nor did the attorneys for *Miss Allerdice* act in any adversary way to *Mr. Strohmeyer* or his attorneys.

On the evidence mentioned and papers returned from county court giving some general idea of the work done in that court, the circuit court reached these conclusions:

Three thousand dollars is a reasonable allowance to the executor for attorneys' services rendered in county court, the same to be equally divided between the two firms performing such services, and each firm should refund $1,000 of the amount received upon the adjudgment in such court. The value of the services to the estate, of Ryan, Merton & Newbury, is equal to that rendered by attorneys for the executors and executrix respectively and under a stipulation made should be so fixed, to wit, $1,500, and, therefore, they should refund $1,000 of the amount received by them on the adjustment in county court. The compensation allowed in county court to *G. Holmes Daubner* as guardian *ad litem* is reasonable. Judgments should go in favor of the executors as follows: Against defendants composing the firm of Ryan, Merton & Newbury for $1,000 and interest from the time same was paid to them by the executors; against the defendants, members of the firm of Nath. Pereles & Sons, for a like amount; against the members of the firm of Connell & Weidner for a like sum, and against *Henry Lockney* for a like sum. The executors should stand charged in their account as having $4,000 yet belonging to the estate with interest thereon from the time they parted therewith under the adjustment in

county court till refunded by them or into their hands by those who receive the overpayment, said executors to account for said $4,000 and interest to the person, or persons, entitled thereto in the final distribution of the John A. Rice estate.

Judgment was rendered accordingly, the amount in each recovery adjudged in favor of the executors being $1,121.50, aggregating $4,486. From such judgment the following appeals were taken to this court:

1. *George W. Strohmeyer,* executor, joining with *Libbie Allerdice,* executrix, the former represented by Miller, Mack & Fairchild, attorneys, and the latter by Connell & Weidner, attorneys;

2. *Samuel A. Connell* and *Adolph J. Weidner* as firm of Connell & Weidner and individually, represented by themselves as attorneys;

3. *Thomas J. Pereles, Nathan Pereles,* and *Emil J. Rahr,* as firm of Nath. Pereles & Sons, by such firm as attorneys;

4. *May R. Cowie, Lulu Rice, Rhea F. Rice, Delia Rice* as general guardian of *Magdalena Grace Rice,* and *May R. Cowie* as general guardian of *Lloyd (Beebe) Cowie,* by C. E. Armin, their attorney;

5. *George D. Puffer,* as executor of the last will and testament of Timothy E. Ryan, deceased, *Ernst Merton* and *C. W. Newbury* as surviving partners of the firm of Ryan, Merton & Newbury, represented by M. A. Jacobson, their attorney.

On behalf of the executrix and executor of the will of John A. Rice there was a brief by *Connell & Weidner,* attorneys for *Libbie Allerdice,* and *Miller, Mack & Fairchild,* attorneys for *George W. Strohmeyer,* and the cause was argued orally by *S. A. Connell* and *Geo. P. Miller.*

*C. E. Armin,* for the appellants the heirs of John A. Rice.

There was also a brief by *Connell & Weidner,* appellants, *in pro. per.,* and oral argument by *S. A. Connell;* also a brief by *Nath. Pereles & Sons,* appellants, *in pro. per.,* and

*Charles S. Carter,* of counsel, and oral argument by *Mr. Car-ter.*

*M. A. Jacobson,* for the appellants *Ernst Merton* and *Charles W. Newbury* as surviving members of the firm of Ryan, Merton & Newbury, and *George D. Puffer* as executor of the will of Timothy E. Ryan; also for the respondents *Ernst Merton* and *C. W. Newbury.*

*G. Holmes Daubner,* respondent, *in pro. per.*

The following opinion was filed June 19, 1912:

MARSHALL, J. For the foregoing picture, we venture to say, there is no precedent in the history of judicial distributions of the estates of deceased persons. There was a will,— a model for brevity, conciseness, and clearness, considering the magnitude of the estate and number of persons to be remembered efficiently. It is not claimed, and could not well be, that there was any ambiguity in the instrument from the opening lines to the closing of the fourth codicil. Scrupulous care was exercised to avoid uncertainties and guard against danger of interference with the testamentary scheme upon the ground of incompetency or undue influence. The testator had reason, sufficient in his judgment, for any distinction made between the two branches of his family, for not making much provision for his son or daughter, and for removing his estate so far beyond their control as to insure its reaching the grandchildren in their full maturity. That, in general, he exercised wisdom is demonstrated by the record. In the proceedings to displace the testamentary scheme, incapacity is seen in both families to handle the property, as suggested in the will. *Mrs. Cowie* rather corroborated the testamentary declaration as to her husband by declaring that neither she nor he possessed any property or means whatever and that both were so heavily in debt that they needed immediate relief out of the estate. Here, we may well say in

passing, Mr. Cowie later laid claim to well nigh $7,000 from the estate and, by agreement with the attorneys representing the executors, obtained over $3,000.

The whole history of the case shows that Mr. Rice well understood what property he had, its value, how much he owed, and necessity for disposing of his estate in some such way as he did to prevent its being wasted; that, instead of acting from impulse or mere prejudice, he was moved by deliberate judgment, the will bears evidence and subsequent events vindicate, circumstantially. He evidently realized that discrimination between the two branches of the family and failure to make larger provision for his two children might, unexplained, give rise to dangerous and expensive attempts to disturb his scheme when the time came for executing it; so, he made such explanation on the face of the will. To further guard against it being claimed the will was not his own deliberate act with full appreciation of all moral rights to share in his bounty, a year after it was first executed he added a codicil, putting a favorite grandson,—a child of his daughter *Mrs. Cowie,*—on the same basis as to direct benefits as the children of his son Frank, with such valuable contingent rights as to succeeding to the provision made for the latter's children as to place the two families quite nearly on a par. Frank was then alive and he and the daughter, personally, were treated substantially alike, the dominant idea in the scheme being, from the first, to preserve the estate for the grandchildren. With this material change the will was, inferentially, ratified and re-executed.

After some six months' further deliberation, for greater certainty that his scheme would be understood and executed, particularly the dominant feature that the *corpus* with its accumulations should be held in trust for the benefit of his grandchildren till such time, in all reasonable probability, if ever, as it would reach them without interference from the parents on either side and they would be competent to look

after their interests, he made a second codicil postponing distribution till the death of Frank and the arrival at the age of thirty years of his youngest grandchild on either side, declaring his intention, more specifically, as to the termination of annuities, explaining and affirming some changes made by interlineations in the first codicil, and expressly reaffirming the will as first drawn subject to the changes wrought by the two codicils.

. Some two weeks thereafter, the will was a third time, inferentially, reaffirmed by the addition of a third codicil in which further provision was made to preserve that portion of the estate set aside, absolutely or contingently, for the branch of his family represented by his daughter; giving the brother and sister of *Lloyd (Beebe) Cowie* the right, contingently, to succeed to his right and a right of succession between themselves and right of *Mrs. Cowie* to take as successor of her daughter in respect to previous provisions made for the latter, in case of the daughter dying during the existence of the trust.

About three weeks later, and a short time before his death, Mr. Rice made a fourth and last carefully drawn codicil, making provision, in minute detail, for the Masonic body of which he, presumably, was a member—taking occasion again to expressly reaffirm the will and codicils. He took further precaution to consult with his confidential friend, *Strohmeyer,* respecting his scheme and exact an opinion that it was legitimate and could be carried out.

So it will be seen that the two branches of Mr. Rice's family were treated, from his standpoint, alike, so far as due conservation of the property for the benefit of the grandchildren would permit. The thought was that, in no event, should there be any very considerable distribution of either principal or income during the life of his son Frank, nor till his youngest grandchild should come to the age of thirty years, a period of some seventeen years from the time the will was made. . The reasons therefor are so circumstantially ap-

parent that the fact itself casts no suspicion upon the will. If there were any difference in the treatment of his two children, personally, the odds were in favor of *Mrs. Cowie.*

The foregoing history, with other matters to be referred to later, is appropriate, bearing on the question of the legitimate services required, or permissible, in the settlement of Mr. Rice's estate, and the limit of reasonable expense therefor, which is one of the main subjects for consideration on this appeal, and with reference to other matters material to the case.

It seems, from the foregoing and what occurred with reference to the will, that *Mrs. Cowie* was interested in having the will set aside, not so much because she was personally discriminated against as because she thought her three children were not favored equally with the *Rice* children, and, because the estate was put entirely beyond her reach and that of any of her children for a long term of years. To set aside that dominant feature of the scheme, all parties were interested, though not, perhaps, in equal degree, and to accomplish it, all co-operated as the statement of facts shows, including those acting by guardians *ad litem,* executors, and their attorneys as well.

The proceedings to contest the will in the county court appear to have been merely *pro forma.* There was no one pecuniarily interested, particularly, to sustain it as the beneficiaries looked at the matter, because enjoyment of the estate by them was so remote. There was no one whose duty it was to sustain it, if practicable, except the executors, their attorneys, the guardians *ad litem,* and the court. An imperative duty rested there. Just what occurred does not appear; but, it sufficiently does that no showing was made adverse to the will which appeared to the judicial mind at all serious. Probably none other than of a most formal character. Chief reliance seems to have been placed on proving that Mr. Rice was mistaken in thinking his daughter was subject to be un-

duly influenced by her husband.  Very little evidence was
offered aside from the usual formal proof.  There were ar-
guments, principally by Mr. Ryan for the contestants and
*Mr. Rahr* for the executors,—whether there were others does
not definitely appear; but, the indications are that the whole
proceeding was comparatively brief and substantially feature-
less as regards anything questioning the validity of the will,
except for an address by Mr. Ryan.  He testified respecting
what was done, as also did *Mr. Rahr,* without stating that
anything occurred showing serious attempt to impeach the
will, except, possibly, the address by Mr. Ryan.  He testified
to having, in his judgment, "made a fine effort," but must
have appreciated that the will could not be defeated by mere
oratory, or except upon clear, convincing evidence that it was
not really Mr. Rice's testamentary disposition though it was
such in form.  Evidently there was no such showing as the
objections were almost summarily overruled.

Presumably, from the record, had the settlement of the es-
tate proceeded in an orderly and ordinary way after the event
last described, it would have been quite a simple matter.
Eliminating the claim of *Mrs. Cowie,* which was withdrawn,
and the large claim of $45,000, which was really not a per-
sonal debt of Mr. Rice's, though, perhaps it might have, in any
event, reached his estate, indirectly, there were very few debts
considering the size of the estate.  The work and difficulties
subsequent to the allowance of the will were caused, mainly,
by the colluding together to destroy it and substitution in
place thereof of a scheme to suit the notions and necessities of
the Cowie family and the Rice family, with, seemingly, inci-
dental large benefits to attorneys and guardians *ad litem.*

As regards any will contest on legitimate lines, the pro-
ceedings in the circuit court were more featureless than those
in county court.  They impress one, strongly, with the idea
that none of the attorneys or the court thought the testament
could be treated as invalid on any evidence which was pro-

ducible. Nothing occurred indicating a serious purpose of really impeaching it in a legal sense. The evidence given was not aimed at any such purpose. The reasons given by the leading spirit in the affair, Mr. Ryan, for displacing the testamentary scheme,—that it was complicated, difficult to carry out, left the property not vested in any one in particular for a long time and so as to render it useless to many interested, and that he had labored hard to arrange a different disposition of the estate,—can hardly be taken seriously from the standpoint of what was really involved in the appeal. There was no difficulty at all about the vesting of title or about carrying out the testamentary plan,—none whatever. The difficulty complained of as to the parties not being able to enjoy the property for a long time, and, possibly, some of them not at all because of their not surviving the trust, was just what the testator contemplated and had a right to have carried out. It is difficult to see how the court could have been influenced by Mr. Ryan's suggestion along that line, or the added one that he had been to a large amount of labor to perfect an agreement between all parties for substitution, in place of the testator's plan, of one agreeable to themselves. Just as valueless for any legitimate purpose in a will contest, was the testimony of *Mrs. Cowie* that she needed a part of the estate for her immediate necessities, and that of *Mrs. Rice* to the same effect, and the testimony of both, under the prompting of attorneys, including those for the executors, that the *Rice* children would not probably survive the trust period and so would not receive any benefit from the estate if the income were tied up according to the testamentary scheme. Those circumstances had nothing to do with the question of whether the purported will of Mr. Rice was his in fact and should be carried out. They rather tended to explain why he made the will as he did. He evidently appreciated, fully, that want of business competency led to the condition testified to. From his experience he could not rea-

sonably expect there would be anything but incompetency in
the future respecting financial matters as to the parents of the
grandchildren on either side; and, so thought it would be
futile to place property with them or under their control with
a purpose that it should do permanent benefit.    He also, evi-
dently, appreciated that his son's expectation of life was brief
and that of the children on the Rice side was likewise short. ·
Those circumstances indicate why the greater provision for
the *Rice* children than for the *Cowie* children was supple-
mented by the right of the latter to supersede the former in
case of any thereof dying before the termination of the trust.
Such rights of survivorship were evidently thought would be
likely to eventually give the Cowie branch half or more of
the entire estate.

Thus the reasons suggested for varying the testamentary
scheme supported the will instead of furnishing any justifica-
tion for disturbing it.    The other testimony offered on the
proposition for judicial approval of the agreed scheme, is as
barren as that specifically referred to of any legitimate
grounds for impeaching the will, indicating that an impeach-
ment thereof, in the legal sense, was not seriously thought of.
The gist of all was that the parties had agreed, with per-
mission of the court, to leave the formal execution and pro-
bate undisturbed, but substitute a new scheme having the
same effect as if it were incorporated in the will as the work
of the testator.    So it was devoted to showing that all, in-
cluding general guardians, guardians' *ad litem,* executors, and
attorneys for them, understood the agreement and approved
of it.

The ingenious scheme for judicial approval of the probate,
in form, but displacement of the will in fact and substitution
thereof of one arranged by treaty, the circuit court seems to
have easily lent judicial approval to—not even requesting pro-
duction of evidence justifying the division of $20,000, or some-
where around one fifth of the net *corpus* of the estate, between

attorneys and guardians *ad litem* for their work of destruc-
tion.   The judge remarked, in effect, that such matter was
not one of judicial concern, since the parties and their at-
torneys, who knew all about the facts, had agreed respecting
the subject.

There is no reasonable explanation of the attitude of at-
torneys, court, and others concerned in what was done, except
it was thought the parties interested in the estate could, legally,
all agreeing, notwithstanding it was largely left to minors, do
anything they saw fit therewith, even the appropriation of a
large part for the attorneys and guardians *ad litem* for their
services in setting aside the testamentary scheme by treaty.
Erroneous as it seems to be, in view of elementary principles
governing the matter and the decisions of this court, notably
*Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103;
*Sumner v. Newton,* 64 Wis. 210, 25 N. W. 30; *Ruggles v.
Tyson,* 104 Wis. 500, 81 N. W. 367; *Frame v. Plumb,* 135
Wis. 24, 114 N. W. 849; *Will of Dardis,* 135 Wis. 457, 115
N. W. 332; *Bussell v. Wright,* 133 Wis. 445, 113 N. W. 644;
*Patton v. Patrick,* 123 Wis. 218, 101 N. W. 408,—the idea
that the wishes of the testator, the public policy crystallized
in the law respecting the inviolability of trusts, particularly
those created by will, with clear indications of intent to render
the beneficiaries incapable of terminating them, stood at all
in the way of the wishes of the *cestuis que trustent,* so long
as all agreed to substitute their own will therefor, does not
seem to have occurred to parties, attorneys, guardians *ad
litem,* executors, or court having to do with the matter.

So the deed was done,—nothing very material being left,
as before indicated, of the testator's scheme but the shadow
of a probate in county court, affirmed in circuit court.   Such
probate was solemnly adjudicated by the appellate court to
be affirmed while no such thing, in practical effect, occurred.
On the contrary, the thing probated was, to all intents and
purposes, set aside without any evidence or suggestions to

impeach it, and a scheme neither provided by will nor by written law,—one in clear violation of a testamentary prohibition as plain as words could make it, substituted in its place.

There is no precedent for the proceedings described, so far as we know. We venture to say none exists, nor any principle justifying it. The only explanation of it is probable misconception of the scope of the rule that all the beneficiaries of a trust may, by agreement, the trustees consenting, terminate the trust and the limitation thereof as indicated in the decisions of this court. Nevertheless there is, in form, a solemn judgment of the circuit court substituting the wishes of the Cowie family and Rice family, under the guidance of their attorneys and judicially appointed professional representatives, they participating in the benefits, and it has not been appealed from. There it stands, in form *res adjudicata,* as to the matters referred to therein, and is relied upon as a conclusive bar to any inquiry in regard to the main difficulty complained of on this appeal, regardless of whether, as an original matter, it involves a great wrong or not.

We pause at this point to emphasize the stated displacement of the testamentary scheme, by this brief summary of the most significant differences between it and the one substituted therefor.

The plan that four grandchildren, subject to some small bequests, should take the entire net estate with its accumulations, aggregating within reasonable probabilities $200,000 or more, at the end of the specified trust period, all to be divided equally between such grandchildren, subject to some rights of survivorship, carefully designed to effect a plain and legitimate purpose, was changed into one for a division of the *corpus,*—depleted by about one fifth for expenses of making the substitution and a further large amount in advances to beneficiaries,—at the end of such period, the income in the meantime to be distributed as it might accrue.

*Mrs. Cowie,* who was not, by the will, given anything, ab-

solutely, and only a small amount, contingently, was by the new scheme made equal with the grandchildren in the depleted *corpus* and income—and more, in that she was advanced on her share $5,000, and the bequest to each of the *Rice* children in such depleted *corpus* was reduced one twelfth to make up her share.

The contingent right, under the will, of *Lloyd Cowie* to succeed to the share of any of the *Rice* children not surviving the trust, was displaced by an obligation binding him to pay $100 per year for five years to each of the other *Cowie* children and an elimination of all contingencies as to his fourth.

The scheme for distributing all property in four shares as personalty, except a small amount, was changed for one distributing the estate, depleted as before stated, in five shares representing individual undivided interests in realty and personalty, subject to the advances aforesaid.

The *corpus* and income which, subject to depletion of the former $5,000 for the Hartland lodge and family monument, should have remained in trust for the four beneficiaries at the termination of the administrative period,—a probable $200,000 or more, at that time,—was reduced to $74,891.39, subject to such $5,000.

The contingent trust for *Mrs. Cowie* was changed to an advance of $5,000 out of the *corpus* of the estate and an interest in the residue sufficient to make one quarter of the whole.

The prospective interests of each of the grandchildren of over $30,000 in *corpus* at the commencement of the trust, in the form of personalty, was displaced by an individual undivided interest in realty and personalty, in trust, of the value of less than $20,000 as to *Lloyd Cowie* and $12,000 as to each of the *Rice* children.

The testator's reasonable expectation of his estate being settled at an expense of around $6,000 was changed by the agreement to over $35,000.

If it were clear that the matters covered by the judgment

in the will contest could not be inquired into collaterally, as the trial court ruled repeatedly, narrowing the scope of the inquiry and the decision accordingly, much less attention would have been devoted to the full history of what occurred. If the judgment were only erroneous, and therefore conclusive till set aside in some direct proceeding to that end, yet from an original standpoint all wrong and indefensible, it would seem, we must confess at first impression, perhaps the less said about it the better. Such an apparent travesty upon the administration of justice, irremediable, spread in detail upon the record, would tend to reflect discredit, not only upon the participants therein but upon the judicial system which would render it possible in the first instance, moreover, render the wrong remediless for mere want of a person to seasonably challenge the status established by the judgment. Is the judgment beyond collateral attack? Did the court rule right in respect to holding that it could not look beyond the formal closing of the will contest? That is by far the most important matter presented now. In briefs on the oral argument, counsel for those interested in justifying the trial court's rulings iterated and reiterated that the matters covered by the judgment were a closed book,—referring to the familiar rule that such a pronouncement, within the scope of the court's power, is, till challenged otherwise than collaterally,—deemed to speak words of truth. Repeatedly, on such argument, an effort was made to turn counsel's attention to the allowance in circuit court of $20,000 to attorneys and guardians *ad litem*. They met it, again and again, by invoking the rule of *res adjudicata* as a shield,—not saying one word in justification of it; but, persistently endeavoring to obtain the benefit of that salutary doctrine embodied in the maxim *"Judicia sunt tanquam juris dicta et pro veritate accipiuntur."*

The judgments of the law speak words of truth, infallible, in theory, *ex necessitate,* and doubtless, as nearly in fact, as human wisdom could well approach that ideal; yet, so far, in

possibility, from it, that were it not for the remedies provided
for destroying the vitality of unjust judgments in certain
cases, or avoiding jurisdictional error founded in judicial
usurpation, "the black menaces" which sometimes hover
around and cloud such ideal are such that it would seem pos-
sible to obscure it altogether; but, with all, in the words of
the literary philosopher, quite well illustrated in this case,
judicial instrumentalities are so resourceful, that, it is, in
reality, as secure "as a star in the maw of the clouds." True
to that, notwithstanding the repetition of effort to cover
the wreck wrought in the will contest with the shield of
*res adjudicata,* the question as to the division of $20,000 of
Dr. Rice's estate between the actors in that transaction would
not and will not down. The specter, so to speak, of the mur-
dered will, like Banquo's ghost would not and will not vanish,
except temporarily. It appeared here and there though
brushed aside now and again. It took a place at the table on
the argument, stimulating the only one who had no part in
the destruction and no reason for excusing it and whose hands
were clean of the stain of it—all to his credit,—to declare
in the face of the menace of the overshadowing apparition,
"Thou canst not say I did it." It would not down perma-
nently because the rule invoked, and seemingly the only
thought of effective defense, had no application to the case.

If the court exceeded its jurisdiction of the subject matter,
then the judgment is no protection whatever. It may be ig-
nored altogether. *Peck v. School Dist.* 21 Wis. 516; *Blodg-
ett v. Hitt,* 29 Wis. 169; *Damp v. Dane,* 29 Wis. 419; *Mathie
v. McIntosh,* 40 Wis. 120; *O'Malley v. Fricke,* 104 Wis. 280,
80 N. W. 436; *Harrigan v. Gilchrist,* 121 Wis. 127, 228, 99
N. W. 909; *Hughes v. Cuming,* 165 N. Y. 91, 58 N. E. 794;
*Cooper v. Reynolds,* 77 U. S. 308. The rule is elementary,
that if the matter dealt with by the judgment in this case was
entirely outside of the court's jurisdiction, then, as said in
the last case cited, the result was not merely erroneous and so,

binding on all parties which the court had jurisdiction of, and their privies, till set aside in some of the ways appointed by law, not including collateral attack, but was a usurpation and, as said in *Damp v. Dane, supra,* the proceedings void in the broadest sense of the term. To satisfy the foregoing, manifestly, the jurisdictional defect would have to go to the fullest extent to preclude the parties to the litigation from attacking the judgment collaterally, since, for the time being, all consented to what was done, so far as they had capacity to consent. It follows that, if what was done was not within the scope of a will contest, yet the parties saw fit to mutually bring it into the litigation and the court had jurisdiction of such subjects, the result cannot be considered entirely outside of its authority and so void.

Jurisdiction of the subject matter is not, necessarily, measured by the scope of the controversy as presented by pleadings. Generally speaking, as said in *Cooper v. Reynolds, supra,* "By jurisdiction over the subject matter is meant the nature of the cause of action and of the relief sought; and this . . . is to be sought for in the general nature of" the court's "powers, or in authority specially conferred." The cause of action within the scope of the court's authority may be as broad as the parties see fit to make it by agreement, subject to refusal to entertain it in an irregular way. So the limitation is to be determined in any particular instance by whether the court has jurisdiction of such subjects, as said in *Harrigan v. Gilchrist,* 121 Wis. 127, 229, 99 N. W. 909, or, as said in *Hughes v. Cuming, supra,* whether it had "power to act upon the general, and, so to speak, the abstract question and to determine and adjudge whether the particular facts presented called for the exercise of the abstract power."

The foregoing leads up to the inquiry of whether the circuit court for Waukesha county had judicial power over such subjects as changing the testamentary disposition of prop-

erty from the plan made by the testator to one agreed upon by
all the beneficiaries, especially where they were, in part,
minors.    Did it have jurisdiction in the broad sense of power
over such matters, as indicated in *Harrigan v. Gilchrist, supra,
Vaughn v. Walsh,* 122 Wis. 486, 100 N. W. 840, and the
like?    Was the abstract question itself,—that of whether the
will of a testator or that of the beneficiaries thereunder shall
be the rule for the administration and disposition of the
former's estate, within the scope of the power of a circuit
court to decide?    It must be conceded that such questions are
entirely foreign to the scope of a will contest.    If a circuit
court has no authority to entertain an equitable action to deal
with such a matter, then it has none to permit the parties to
turn such contest action into the form, in effect, assumed here
when the cause was closed by judgment.    It was then no
longer a will contest matter in any proper sense; but, an
equitable action in which all beneficiaries under Dr. Rice's
will were parties, to set it aside and make a new one to suit
their own notions and necessities,—not because it was invalid
but because they preferred a different way of parceling out
his property.

The numerous counsel interested in supporting the circuit
court's assumption of authority have failed to cite us to any
principle or authority justifying it.    Maybe necessity there-
for was not appreciated.    In general, it seems to have been
assumed that there was no absolute want of power involved,—
only a question of judicial discretion and perhaps not even
that,—but that the sole question was whether an agreement
between all parties interested was binding on the court; and,
so, evidence was confined, as indicated in the statement or as
we shall see, to discover whether the writing submitted em-
bodied the real wishes of the parties.

An illustration of the distinction between jurisdiction of
the subject matter in the technical sense, rendering a judicial
determination, however erroneous, binding till impeached in

some of the ways provided by law, and a mere assertion or
pretense of jurisdiction without any real foundation for it
whatever, rendering the judicial determination in respect
thereto utterly void, is found in *Melia v. Simmons,* 45 Wis.
334; *Frame v. Thormann,* 102 Wis. 63, 79 N. W. 39; *Wis.
T. Co. v. Wis. M. & F. Ins. Co. Bank,* 105 Wis. 464, 81 N.
W. 642; *Harrigan v. Gilchrist, supra; Jordan v. C. & N. W.
R. Co.* 125 Wis. 581, 104 N. W. 803; *Griffith v. Frazier,*
8 Cranch, 9, 23; *Scott v. McNeal,* 154 U. S. 34, 14 Sup. Ct.
1108; *Cunnius v. Reading School Dist.* 198 U. S. 458, 25
Sup. Ct. 721.

The county court, as indicated in the cited cases, having
jurisdiction only of the estates of deceased persons in respect
to administering the same, the power does not become active,
in any particular instance, till the person over whose estate
the authority may be asserted is actually dead. A mere alle-
gation and adjudication in proceedings to that end does not
suffice. If, notwithstanding that, it turns out that the person
adjudged to be dead is in fact alive, all proceedings in respect
to his estate are utterly void. The fact of death, irrespective
of any adjudication respecting it, is essential as said, in ef-
fect, by MARSHALL, C. J., in *Griffith v. Frazier, supra,* to
give judicial competency to deliberate in respect to the mat-
ter at all, though if that essential fact exists and the court, in
due course, appoints one as administrator not entitled thereto
by law, the act is binding until annulled by competent au-
thority. The matter of such appointment is subsidiary to the
basic fact going to the power of considering, at all, the mat-
ter of granting letters of administration. Thus, if the sub-
ject of administering one's estate be deliberated upon without
the precedent condition of death existing, it is not, under any
circumstances, a matter of judicial cognizance, the court has
no jurisdiction of such subject, or, in other words, of the
subject matter, within the rule, while if the basic condition
exists a mistake as to the proper person to take administra-

tion or even a wrong determination as to the existence of any other subsidiary matter such as the existence of property within the state, as in *Jordan v. C. & N. W. R. Co.,* or the place of domicile, as in *Frame v. Thormann,* is in the field of mere judicial error. Applying that to the case in hand, the next inquiry must be as to whether the circuit court had any right, whatever, to deliberate respecting the proper scheme for a distribution of Dr. Rice's property, even to the extent of approving and giving force to the agreement of all parties entitled, in any event, to share in the estate.

Further discussion of the vital question above suggested might take a wide range; but, after all, it is so plainly governed by principle and the logic of the decisions of this court that it may well be greatly narrowed from its possible scope. The writer would rather court the opportunity for an extended discussion thereof than seek to avoid it, but perhaps the more brief treatment will make the better precedent while it will be ample for the result reached.

The right to make a will is more sacred than the right to make a contract. The latter, as evidenced by the writing, may be judicially reformed or set aside upon equitable ground. The former cannot. *Machem v. Machem,* 28 Ala. 374. The court and parties must take it as they find it and,— if valid, abide by the intent embodied in it so far as that can be discovered. There is no judicial power even to correct a will which extends beyond the field of construction and interpretation. 1 Pom. Eq. Jur. (3d ed.) § 371, note.

Said the eminent Chief Justice GIBSON, in *Bash v. Bash,* 9 Pa. St. 260, "Every sane man must be allowed to make his own contract as well as his own will." A court might as well usurp the functions of making wills for the dead as contracts for the living. In *Greenwell v. Greenwell,* 5 Ves. Jr. 194, under most distressing circumstances, a court of equity allowed a slight departure from the terms of the trust, practically, on the theory that, in the changed situation, it was really carrying out the presumed wish of the testator, and,

only then, upon consent of all parties interested, all being treated alike. The Lord Chancellor remarked: "I fear, if I should make a decree, it would be my will, and not the testator's;" but, his scruples were overcome upon the consideration suggested. In harmony therewith, this court, speaking by RYAN, C. J., in *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, said:

"Breaking a will is very much like making one;" imposing upon the testator a rule for distribution of his estate "against his solemn wish in dying." "Every one should have the same power to dispose, by will, after his death, in accordance with his own wishes, of whatever he may leave behind him in his own sole right, as he had in life to dispose of it by contract or gift. And it is as much the duty of courts to uphold and enforce his will after death, as to uphold and enforce his contracts made during life."

The right to make a will is very ancient and considered as incidental to the right to acquire property and so one of the inherent rights guaranteed by the constitution. Its recognition antedates common and civil law. It is as ancient as any sort of civilization. It has been held sacred in all nations and under all conditions. Schouler, Wills (3d ed.) §§ 12–17; 30 Am. & Eng. Ency. of Law (2d ed.) 549.

At the time of the adoption of our fundamental law no right was more firmly entrenched in the policy of this country or significantly a part of the common law, than that to make a will. Therefore it was guaranteed by sec. 1, art. I, of the constitution and was also made fundamental by sec. 13, art. XIV.

This court said in *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627, the common-law conception of the right of persons to control the disposition of their property after death, subject to legislative regulation, is one of those rights referred to in the words of the constitution:

"All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the

pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed." Art. I, sec. 1.

Nowhere, at any time, has that right been given greater dignity than in *Nunnemacher v. State.* Its history was there traced as a birthright from the first born and was established as of undoubted constitutional recognition and beyond any earthly power, except that of the people in an original effort to form a government, to take it away.

In *Will of Dardis,* 135 Wis. 457, 115 N. W. 332, the same logic ruled. In conformity thereto it was pointed out that there was a settled legislative policy in this state requiring the establishment of every valid will, even in case of all the parties interested consenting otherwise. The force to be given to that policy was indicated by reference to sec. 4505, Stats. (1898), making it a crime to conceal or suppress a will, regardless of the attitude of the beneficiaries thereunder. Also secs. 3784, 3785, 3786, and 2296, Stats. (1898), were referred to,—all indicating the high character in which testamentary dispositions of property are to be regarded. Therefrom the conclusion was reached, that regardless of holdings elsewhere, in this state, a will, once validly made and subsisting to the death of the testator, must be taken and judicially enforced according to his intent, if that can be ascertained; that parties cannot be permitted, even though all interested join, by any agreement between themselves or any subterfuge to displace the dying wish of the testator; that in respect thereto the public at large are, under the policy of our law, so far concerned in the establishment of such a will that the proceedings to that end are in the nature of an action *in rem,* the whole body of the people being parties. The real judicial question involved is one of status. In that instance the parties stipulated to facts which, if they existed, would have avoided the will, and agreed upon a method of disposing of the estate in place thereof and the proponent joined in the

scheme.    The court, nevertheless, allowed the will.    On ap-
peal the decision below was affirmed notwithstanding in-
sistence of all parties that the stipulation was binding on the
court to render judgment displacing the testamentary scheme.
This court affirmed the judgment, remarking in connection
with the declaration that the public is a party to a will con-
test to such extent that the parties thereto cannot set it aside
by stipulation:

"There is also recognized by the courts an interest and
right of the testator to have the directions of his will carried
into effect, at least upon some subjects.    His right is recog-
nized to direct at least the method of management and dis-
posal of his property after his decease, which courts cannot
be compelled to disregard to accommodate the wishes of some
or even all parties having pecuniary interest in the prop-
erty."

The whole reasoning is in harmony with the previous hold-
ings of the court that the right to make a will and have it
allowed and carried out is a constitutional right, affirmed by
statute law, and which courts and parties are powerless to
take away; that it subsists after the death of the testator, he
being recognized as having, in effect, given the court irrevo-
cable power of attorney to carry out his wishes, but not to
violate them.    The sole jurisdiction of the court is to take
note of the testator's intent, so far as it can be discovered by
judicial rules and does not violate the law, and give effect to it.

Cases were cited from other jurisdictions in the *Dardis
Case* upholding the right of parties to suppress a will by
agreement and substitute some new method of distribution;
but, in addition to disapproving of them as plainly unsound,
they were held to be utterly out of harmony with the public
policy here as found in the written law and out of harmony
with the general trend of authorities elsewhere.

A person having exercised his right to make a will, and
done so in accordance with statutory regulations, has pro-
duced a thing and imposed upon the prospective proponent,

the public, and the court specific duties with reference thereto. The mere beneficiaries are not, in the broad sense, the only parties to it; neither are they and those who would take in the absence of a will the only parties concerned, save creditors. Performance of the duty imposed upon the proper person designated by law to propose the will for probate may be compelled and nonperformance thereof punished. The court, having once gained possession of the *res* for the purpose of determining its admissibility to probate, is, to all intents and purposes, possessed thereof as the subject of an action *in rem.* The thing is provable according to its purport only by the witnesses of the law, and disprovable by establishing, as matter of fact, incapacity to make a will, fraud, undue influence, or something of that sort going to show that it is not in reality what it purports to be. Is the thing the will of the testator? That is the sole question. The facts are not provable by stipulation. The proponents have no right to withdraw the thing from the court's possession and jurisdiction. If all the parties appearing themselves withdraw, the thing itself, the will, must still remain in possession of the court. They are powerless to deal with it otherwise than by proving, in the proper manner, that it is or is not what it purports to be. *Syme v. Broughton,* 85 N. C. 367. There can be no judgment of nonsuit, for there is no one competent to submit thereto and no jurisdiction in that regard. The jurisdiction of the court once being challenged upon the subject,—challenged on behalf of the public in general as well as those specially interested,—the judicial doors being opened in response to the instrumentality appointed by law for that purpose,—the question raised must be decided on the evidence or presumptions of law and fact in respect to the matter. *Young's Will,* 123 N. C. 358, 31 S. E. 626. To decide that, is the court's sole function. *Coalter's Ex'r v. Bryan,* 1 Gratt. (Va.) 18. A contract between those interested not to offer a will to probate but to divide the property by agreement, is

void where there are minors; and, even as to adults, such an agreement is *inter partes* and does not affect the question of whether the will shall be probated as written, or not, or affect the matter as between themselves except in so far as permissible under the doctrine of estoppel. *Finch v. Finch,* 14 Ga. 362.

.We might pursue the subject discussed at much greater length but enough has been said to indicate, pretty clearly, the boundaries of the court's jurisdiction in a proceeding for the admission of a will to probate. A moment's thought in respect to the situation, under the law, of property left by a deceased person, will demonstrate the utter impropriety of such a proceeding as a dispersion thereof by agreement. Immediately upon death occurring, in case of intestacy, the personal property devolves upon the court, substantially, as personal representative till one shall have been appointed, and then upon the appointee in trust for a distribution according to law. The title to the real estate immediately vests in the heirs of the deceased subject only to be divested by some proper conveyance or in the administration proceedings. In case of a will, the personalty goes first as in case of intestacy; but, as to the realty, immediately upon the allowance of the will it vests in the person, or persons, intended thereby, subject only to be divested in some manner therein pointed out or some other manner provided by law in the course of executing the will, or by a proper conveyance by the person holding the title. Thus the law disposes of the whole subject. It is not given to the court or parties to make a law to govern the matter,—to devise and execute a scheme divesting some of title upon whom the law has cast it, and vesting it in others, by proving of a will in form but substituting something else in substance. The title to Dr. Rice's real estate vested under the will, or under the law, and could not go otherwise except by force of estoppel which could not apply to minors in any event, unless it was proper for the court to

make the law for the case and do something entirely outside
of the scope of a probate contest, or any other of judicial cog-
nizance of which there is any precedent, or for which there
are any established supporting principles.    It is considered
that the whole subject was outside the judicial authority and
the judgment violating the terms of the will was *coram non
judice.*

So we must conclude, not only that there is a constitutional
right to make a will but that such right includes a right of
equal dignity to have it carried out.    There seems to be no
escape from the conclusion.

Now where did the circuit court find jurisdiction to do
what was done in this case in view of the foregoing?    Its
jurisdiction was confined to applying the law within the con-
stitutional grant of power, not making it or breaking it.    It
derived its authority as to the subject, if it had any, from
sec. 8, art. VII, of the constitution, for there is no statute
affording any such power.    The extent of its power did not
go beyond "all matters civil and criminal within this state,
not excepted in this constitution, and not hereafter prohibited
by law; and appellate jurisdiction from all inferior courts
and tribunals."    The term "matters civil" refers to con-
troversies in law and equity to redress and prevent wrongs
and to enforce and preserve and conserve rights,—not to de-
stroy them,—a jurisdiction after the manner of the common
law as recognized when the constitution was adopted, which
was never understood to extend to the making or breaking of
wills of deceased persons, as indicated by this court in *Dodge
v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, and
other decisions referred to.    Mr. Justice MILLER, in *Cooper
v. Reynolds,* 77 U. S. 308, said: Jurisdiction of the subject
matter "is conferred by the sovereign authority which or-
ganizes the court, and is to be sought for in the general na-
ture of its powers, or in authority specially conferred," mean-
ing conferred by law, not by mere consent of the parties.

It may be that all regarded the will contest in the nature of a proceeding to establish a trust and were misled by expressions in the books to the effect that parties can, and the court may, permit termination of a trust where all parties interested consent thereto, and so thought that the power extended to permitting, in general, what was done in this case and was competent to permit it in will contest proceedings, or at least that it was nonprejudicial, even if irregular, to do it in such proceedings instead of in an independent equitable action. There are many loose expressions in elementary works, and legal opinions as well, that might, taken by themselves, lead to such idea.

This from *Smith v. Harrington*, 86 Mass. 566, 568, is a striking illustration of that:

"The plaintiffs are the heirs, and the only heirs at law of the testator, and are therefore the only parties interested in the enjoyment, or in the final distribution of that part of his estate which still remains in possession of the executors. And as all of the plaintiffs desire that it shall now be distributed, and as the executors make no objection thereto, if they can lawfully pay over the funds in their hands, and express their willingness that the trust should be at once terminated in this manner, and their belief that this will be for the best interest of all parties concerned, there is no good reason why it should not be immediately done. There is no legal or equitable objection to the granting of the relief prayed for in the bill. For considered collectively the plaintiffs are the real and substantial owners of the property, and it is reasonable and just that it should be disposed of in conformity to the desire and preference in which they all unite."

A study of the case, however, indicates that all the parties were *sui juris* and that the broad doctrine stated was pretty clearly fenced about. Other authorities indicate, clearly, that it does not apply where any of the parties are under disability to act for themselves. *Ruggles v. Tyson,* 104 Wis. 500, 81 N. W. 367; *Matthews v. Thompson,* 186 Mass. 14, 71 N. E.

93; *Eakle v. Ingram,* 142 Cal. 15, 75 Pac. 566; *Culbertson's Appeal,* 76 Pa. St. 145; Beach, Trusts, § 705; 39 Cyc. 99.

But the rule stated is not one of universal application. It has been no more definitely limited than by the decisions of this court. *Sumner v. Newton,* 64 Wis. 210, 25 N. W. 30; *Holmes v. Walter,* 118 Wis. 409, 95 N. W. 380; *Patton v. Patrick,* 123 Wis. 218, 101 N. W. 408; *Bussell v. Wright,* 133 Wis. 445, 113 N. W. 644.

In the first case cited the court expressed grave doubts as to whether a trust created, as in this case, can be terminated at all with or without the consent of the court. It was said that it should not be, in any event, without the greatest care not to defeat the cherished purpose of the testator where it is clearly indicated that such purpose was that it should subsist for a particular period to accomplish a particular object, as here; and that such subsistence should be regarded just as sacred as the establishment of it where any other course would violate the clear intention of the testator. It was there urged, on authority, that no court had power to destroy such a trust even by consent of all parties interested—*Douglas v. Cruger,* 80 N. Y. 15, and other cases, being referred to, also sec. 4030, Stats. (1898), prohibiting the court, in supervising the administration of a testamentary trust, from making any order in violation of the terms of the trust and other sections, evincing the legislative policy. The court adopted that view, so far as necessary for the case, remarking:

"It is clearly manifest from the will of Mrs. Goodal that she intended to pledge all the residue of her estate, after the other trusts created therein were executed, to the support and maintenance of Cyprian and Mary G. Chandler during their respective lives, and to place each of them beyond the reach of want while he or she survived, and while any portion of her estate should remain unexpended. . . . In the vicissitudes of human affairs she may come to want. Should such a misfortune overtake her, the intention of the testatrix was to provide a fund to which she might again resort for her main-

tenance. . . . It would be a most pernicious and dangerous
rule to allow testamentary trusts for the support of dependent
persons to be absolutely terminated upon the mere consent of
the beneficiaries, without regard to their capacity or the cir-
cumstances under which such consent was obtained, and with-
out any guaranty against future adverse conditions."

In *Patton v. Patrick, supra,* the court, speaking on the
same subject, said:

"The rights of an owner of property to control its use and
management during his life and after his death, within cer-
tain limitations imposed by law, are among the most sacred,
and entitled to the most careful protection at the hands of
courts, without scrutiny as to the quality of his reasons in
making such choice.   Among these rights is that of preserv-
ing specific real estate as such within a limited time after his
death.   He may think that thereby is assured either a more
certain or larger income than could be obtained by its sale and
the investment of the proceeds, or he may believe that the in-
crease in sale value during that term will be for the best in-
terest of those for whom he desires to provide."

In *Holmes v. Walter, supra,* the power to terminate a testa-
mentary trust was expressly limited to cases where all parties
interested are *in esse,* are *sui juris,* all consent, and "the will
contains no prohibition, expressed or implied, against termi-
nating the trust."

In *Bussell v. Wright, supra,* the court met the question
more decisively, perhaps, than theretofore, holding that, a
testamentary trust having been fully executed and there be-
ing an expressed or implied prohibition against terminating it
till so executed, the court had no authority to disregard it.
There, as here, all parties concerned joined in an effort to
terminate the trust with the result indicated.

The conclusion is reached that, looking at the matter from
any viewpoint, the trial court had no jurisdiction of the sub-
ject matter of displacing Mr. Rice's will.   The agreement to
that end should have been ignored as in the *Dardis Will Case.*

The decree, in form, except the affirmance of the probate in county court, must be regarded as a nullity. All expenditures in the contest which followed incidental to the void agreement were an unjustifiable waste of trust funds. The attorneys, guardians *ad litem,* and others who participated in the depletion, however innocently they may have acted, received the money without right and must be held to account therefor. The subsequent proceedings in county court should have proceeded in accordance with the will and the departure therefrom must be remedied, if practicable, though probably the harm done can never be fully repaired. So far as it can be, it must be, notwithstanding it will, doubtless, cause great hardship to several parties who innocently acted on the advice of attorneys, courts, and court assistants. That cannot be helped. Such a result is possible, though not common in the redressing of wrongs,—though very regrettable, of course, where the transgression involves no bad intent and occurs, largely or wholly, from a purpose, as supposed, to promote a worthy end in a moral sense, yet is so necessary to set things right before the law in the given instance and as an admonition for the future that the court, while trying to temper justice with a high degree of mercy, must be quite blinded to the results and consequences of its decrees. So the claim that the trial court erred in excluding the evidence as to the contest proceedings and in refusing to go behind the judgment, so called, rendered therein, must be sustained.

On the appeal by defendants composing the firm of Nath. Pereles & Sons, the point is made that the court erred in denying their motion for a change of venue. They were proper and necessary parties. In such situation a change of venue is not grantable except upon the application of all upon the same side. All being necessary parties to the main controversy to which the issues as to separate defendants, including Nath. Pereles & Sons, were incidental, making several judgments probable though parts of one general decree cov-

ering the chief controversy, the action could not be split up
and part tried in one place and part in another.    It was an
inseparable controversy with a major issue and several minor
ones germane thereto.    In such cases, an application for a
change of venue by one of several on the same side, or simi-
larly interested, is not within the statute.    That is ruled by
*Wolcott v. Wolcott,* 32 Wis. 63; *Rupp v. Swineford,* 40 Wis.
28; *Eldred v. Becker,* 60 Wis. 43, 18 N. W. 642; *State ex
rel. Rowell v. Dick,* 125 Wis. 51, 103 N. W. 229.    All par-
ties who have appeared, and are not merely nominal; but, are,
really, interested in the controversy on one side though not
necessarily on the same side of the record, constitute one party
within the meaning of sec. 2625, Stats. (Supp. 1906: Laws
of 1905, ch. 282), and must act in harmony, though the affi-
davit may be made in their behalf by any one on behalf of the
others, the motion being in behalf of all.

Complaint is made on behalf of appellants representing the
late firm of Ryan, Merton & Newbury because they were
brought in as defendants.    That is on the mistaken notion
that the agreement displacing Mr. Rice's will was legitimate,
all proceedings thereon valid, and the only matters concerning
such defendants which happened in county court subsequent
to the circuit court judgment, were legitimate matters of
agreement with the parties they represented, who were com-
petent to contract and did so, and that nothing was involved in
the controversy on the appeal impeaching such contract.

As we have seen, Ryan, Merton & Newbury wrongfully
obtained, in the circuit court proceedings or pursuant thereto,
a large amount of the trust fund.    That was a matter which
came before the county court and was involved in the order
settling the final account.    The question was also involved
of whether the county court properly recognized them, in any
event, as having any claim for services in such court, charge-
able to the estate, even if the beneficiaries they represented, or
all of them, had competency to contract with reference to the

matter,—especially whether they had any claim under the contract with the beneficiaries as to the county court proceedings. So it is plain the entire subject covered by the appeal from the final order required their presence in the circuit court action in order to settle the entire controversy.

Error is assigned, generally, by appellants on the side of those seeking to sustain the final settlement in county court, because the circuit court overruled objections to the appeal from county court being entertained as to the attorneys' fees because it was taken after the time therefor had expired. That is predicated upon the fact, as claimed, that such court took up the matter of such fees December 24, 1908, made a verbal order regarding the same and minuted it on the court record, though the formal order allowing disbursement of fees so allowed as executors' expenses of administration was not made except as part of the general judgment of January 9, 1906, settling the final account and assigning the residue of the estate; and so, the time for appealing as to attorneys' fees commenced to run from the earlier date and had expired before taken. The idea is that as to such fees, the proceedings at such date were personal to the attorneys and the result a final order, in every respect, as to them and, in legal effect, as to the executors, even though regarded as advisory as to them, since they acted on the faith thereof in promptly paying the amounts allowed to the several parties and on the assurance that there would be no appeal; moreover, that no objection was made to the order itself prior to the payment; but, complaint was confined to the payments being made out of the income instead of out of the *corpus.*

It seems, from the record, that the facts are about as suggested,—that the chief complaint, at first, was that the income was, largely, temporarily depleted to pay the $10,040. The indications are that the matter of attorneys' fees was, in the main, a subject of agreement on the theory that the attorneys and guardians *ad litem* represented equal interests,

four in number—Ryan, Merton & Newbury for the adult
beneficiaries and general guardians with whom they had a
contract to the effect that they should be allowed out of the
*corpus* of the estate an amount equal to that allowed to the at-
torneys for the executors respectively, *Henry Lockney,* guard-
ian *ad litem* for the minors, Connell & Weidner, attorneys for
executrix *Libbie Allerdice,* and Nath. Pereles & Sons for
executor *Strohmeyer.*

The executors seem to have treated the matter as one of
contract between the attorneys themselves, the beneficiaries,
and guardians *ad litem,* subject to judicial approval, and so
paid very little, if any, attention to the matter,—supposing
that whatever the parties and attorneys agreed to, and the
court approved, was good enough for them.

Thus the fixing of attorneys' fees in county court was
treated as really part of the general scheme formulated in cir-
cuit court to work out the whole matter by treaty as regards
division of the estate between the beneficiaries—the attorneys
and guardians *ad litem* taking orders from the county court,
from time to time, in approval of matters agreed upon and
settling such matters as might require such interference for
want of harmony.   In that there was such dereliction of duty
on the part of the executors and the guardians *ad litem* and
such approach, at least, to jurisdictional error on the part of
the county court in following the void agreement for the dis-
position of the estate, that the proceedings of December 24,
1908, took very much the cast of that in circuit court.   It
was really based thereon.   If the latter had not occurred the
former would not.   The beneficiaries had no right to make
the county court contract, in any event, especially the general
guardians had no authority to join therein nor the guardians
*ad litem* to submit thereto.   Such contract, doubtless, had
something to do with fixing the fees as to the other three in-
terests.   The fact that it was made and the entire proceed-
ing had on the theory that the circuit court contract was the

charter to go by,—a clear mistake of law rather than one of fact under which no real rights were obtained, or obtainable,—is a complete answer to the contention that the time for inquiring into the legitimacy of the order of December 24, 1908, expired in sixty days thereafter on grounds of estoppel. Had the fees of the attorneys been adjusted in due proceedings in the administration of the estate under the will, instead of in direct violation of it, and paid under legitimate circumstances otherwise, a different question would be presented.    The case then would have some semblance to *Carpenter v. United States F. & G. Co.* 123 Wis. 209, 215, 101 N. W. 404; *Vaughn v. Walsh,* 122 Wis. 486, 100 N. W. 840; *Schinz v. Schinz,* 90 Wis. 236, 247, 248, 63 N. W. 162; and other cases cited to our attention.

True, it is the law that if an executor or administrator presents a matter to the supervising court for an advisory order, or presents a matter for adjudication proper to be so presented, and parties interested have due notice and opportunity to be heard, time for appealing commences to run from the time the result is announced, whether embodied in a formal order or merely minuted on the court record; and, unless challenged seasonably for correction in the same court or on appeal, it is conclusive.    Such is the doctrine of *Schinz v. Schinz, supra,* and we affirm it.    As a rule, all ordinary judicial advisory directions, within the range of reason, in the business matters of administering a trust, made upon a presentation of the facts with due care, though without notice to the parties interested, and acted upon in good faith, protect all parties concerned, as more fully shown hereafter under another head.    *Harrigan v. Gilchrist,* 121 Wis. 127, 384, 385, 99 N. W. 909.    The difficulty here is that the direction does not fall within either of the fields suggested.    It was made on a request for settlement of a vital feature of the executor's account, but based on a wholly illegitimate situation to which all herein concerned were parties.

As we have before seen, the Ryan, Merton & Newbury contract in county court was of such character and gave such cast to all proceedings of December 24, 1908, theretofore and thereafter, relating to attorneys and guardian *ad litem* fees in county court, that there, really, was no jurisdictional foundation to start the time for appealing till the entry of the order of distribution January 9th thereafter. We cannot consider the occurrence of December 24th as an ordinary one on application for a final judicial word, judicially spoken, regarding disbursements for expenses of the nature involved. Had it been, doubtless time for appealing would immediately have commenced to run. The whole proceeding was so extraordinary that it is difficult to locate the particular matter within any principle. If there is any such definitely applicable thereto, the books, we venture to say, are barren of any illustration of it.

Counsel for the Ryan, Merton & Newbury interest appreciated the difficulty suggested and contended, as we shall hereafter see, that the whole proceeding as to the contract was extra-judicial,—a mere arbitration, if anything. We do not wholly adopt that view, as before indicated. The contract matter was brought into the general consideration as to counsel fees for the estate, resulting as it seems in the suggestion of $10,000, one half to be specially impressed with the character of compensation for the attorneys for the executors, one quarter with that of compensation for the guardian *ad litem*— really an assistant of the attorneys for the executors, and one fourth with that of compensation for the attorneys for the beneficiaries, in practical effect second assistants to the attorneys for the executors.

On the whole, we incline to the idea, as before indicated, that there was no real judicial disposition of the matter of allowing fees till the subject was covered by the final order, and that whatever was said theretofore was either tentative or nonjudicial. Such parceling out of part of the estate to

attorneys for the beneficiaries and guardians *ad litem* in connection with the previous history has quite the cast of being wholly *coram non judice.* The payments on account of the $10,000 were doubtless made on the faith of the probable allowance in the final account rather than of anything which occurred December 24th, or prior thereto.

Coming to the finality of the allowance of the $10,000 in the order of distribution, the matter was within the subject matter of the court's discretion. If that order was a protection to the executors in paying any part of the $10,000 in face of a possible appeal, it was a protection as to all of it, and it was such protection as we shall see, if the executors made the payments in good faith. With the order of the court within its jurisdiction, the advice of counsel at all points besides, and the apparent consent, for the time being, of all, we can hardly see any warrant for holding there was bad faith in this matter. True, there are many circumstances which well might have put the executors on most diligent inquiry respecting the general scheme of dispersion of the estate in violation of the will, the attorneys and guardians *ad litem* participating, and in a way to suggest, somewhat, want of attention to their duties to the trust they were responsible for conserving, and made them hesitate and perhaps refuse to make the payments, or at least to finally comply with the details of the order of distribution, till expiration of the time for appealing, yet we are not inclined to hold, under all the circumstances, that there was any negligence in the matter amounting to bad faith.

The point is made on behalf of appellants *Merton* and *Newbury* that the court erred in changing the compensation fixed for the firm of Ryan, Merton & Newbury because it was really a matter of contract with the beneficiaries; that the county judge merely acted as an arbiter in the matter with authority to award such firm, on account of the respective interests of the heirs in the *corpus* of the estate and chargeable thereto

accordingly, a like sum to that awarded the attorneys for
the executors respectively; that his act was not judicial and
therefore was entitled to prevail though the amounts awarded
the attorneys for the executors were reduced on appeal. It
seems counsel contend for a construction of the writing ac-
cording to the letter which clearly violates its spirit. It did
not leave the matter in question to the county judge but to
the court. The purpose was to have the members of the firm
recognized as having been, all through, attorneys for the
legatee active interveners in the administration proceed-
ings,—not merely as independent overseers of the other at-
torneys, but as instrumentalities to do their work in fact or
join with them therein, at the expense of the estate with the
understanding that all should, practically, have the same
status as if attorneys for the executors. The general trend of
matters from the time of the circuit court contract to that in
question is in harmony therewith. Ryan, Merton & New-
bury, as indicated in the statement of facts, in all things they
were concerned in, performed work within the scope of that
of attorneys for the executors. They were treated as if en-
titled to do so. After the work was nearly all done the writ-
ten contract was made in harmony with the general conduct
of matters. That led the county court to suppose such con-
tract should be treated as of judicial cognizance and the cir-
cuit court to suppose that the status created by the arrange-
ment at the start was intended to continue to the end, in har-
mony with the writing. However, since the parties contracted
on an entirely false notion of the interest of the beneficiaries
and the latter were seemingly dominated largely by persons
who had very little personal concern in the matter, the whole
being referable to the illegal circuit court agreement, it fur-
nished no basis for fixing any fees in favor of Ryan, Merton
& Newbury. Independently of the agreement, the benefici-
aries, except as to the minors by their guardians *ad litem,* had
no right to be represented by attorneys in the settlement of

the estate at the expense thereof.    It was the duty of the attorneys for the executors to perform, in general, all legal services chargeable to the estate, and that of the guardians *ad litem* to see that they did not do the work for them and at the end combine to have several sets of attorneys' fees instead of one allowed, as there were here, practically all referable to the legitimate work of the executors or their legal advisers.

If the conclusion were otherwise as to the Ryan, Merton & Newbury agreement, it is difficult to see why the point made by appellants who challenged the county court's order that such agreement was unenforceable because contrary to public policy and should not have been recognized by either county or circuit court, is not sound.    As attorneys for the general guardian and the adults, it was their duty to insist upon the attorneys for the executors and the guardians *ad litem* performing their duty.    That was really their whole scope of legitimate employment.    If the estate had been administered in the proper way under the will, full performance of such duty would have left very little for them to do as compared with that devolving upon attorneys for the executors. So in contracting in writing the parties must have had in contemplation, as has been indicated, that the work had been substantially joint, in plain violation of law.    That seems to be too clear to have escaped the attention of the county judge. It doubtless did attract his attention, but he supposed the illegal agreement in the circuit court was binding and justified the continuance of the scheme embodied in it to the end. Looking at the matter in the proper light, respecting a legitimate handling thereof, it was the duty of Ryan, Merton & Newbury not only to see that the attorneys for the executors performed their duty but to resist allowance of any compensation to them in excess of what was reasonable for what they actually did which was reasonably necessary to be done.    Yet they put themselves by the written contract into a position where they were interested in having as large an amount as

possible allowed such attorneys. The greater the expense in that direction the greater the enrichment of themselves. The general result, naturally, was the allowance of a sum in all, divided into the four parts, each about equal to the fair value of the reasonably necessary services in the whole, considering that one competent attorney, or firm of attorneys, was ample therefor. We cannot approve of the written county court contract. It should have been held void on grounds of public policy and the compensation granted the attorneys for the executors held to cover all expense of that nature chargeable to the estate.

The further point is made on the part of the Ryan, Merton & Newbury branch of the case that the circuit court erred in holding that the $5,000 allowed to them by the circuit court agreement covered their services rendered in county court prior to the appeal in the will contest matters. That may be, but if so, the whole subject has been eliminated by condemnation of both the circuit court and county court contracts, as illegal.

The claim is made on behalf of the executors that they acted in good faith in disbursing the trust fund,—doing it always on judicial directions,—and so are entitled to protection against any personal liability, especially on complaint of the parties who consented to the disbursements. The rule invoked is good in its place.

Doubtless if an executor, acting reasonably and in good faith, disburses money pursuant to an order or direction of the court which it had jurisdiction to make, he is protected in so doing, and, so long as he acts reasonably, he is not obliged to anticipate an appeal and for his protection delay proceedings until the time thereof shall have expired. That must be so, otherwise the administration of trusts under judicial supervision would be intolerably impaired. That courts have so ruled, as counsel contend, would be taken for granted. *Vaughn v. Walsh,* 122 Wis. 486, 489, 100 N. W. 840; *Ernst*

*v. Freeman's Estate,* 129 Mich. 271, 88 N. W. 636; *Fraser's Ex'r v. Page,* 82 Ky. 73; *Estate of Pritchett,* 51 Cal. 568; *Loring v. Steineman,* 1 Met. 204; *Pierce v. Prescott,* 128 Mass. 140; *Shores v. Hooper,* 153 Mass. 228, 232, 26 N. E. 846; *In re Macky's Estate,* 46 Colo. 79, 102 Pac. 1088. Any ordinary order or judgment of the county court, entered without inexcusable fault on the part of the executor, and acted upon by him, reasonably and in good faith, while not interrupted by any stay or appeal, though within the time for appealing, protects him as to all parties against whom, presently, it is binding. The difficulty is to bring the matters in controversy within such rule. It applies to the regular administration of an estate for distribution under the law or under a will. The administration here was, largely, under neither, but in violation of both—an administration of a sort of arbitration agreement, which the parties, attorneys, and guardians *ad litem* entered into without right. It does not apply if there is such want of jurisdiction as to render the proceedings utterly void. In any event it does not apply in case of want of due care either in respect to properly presenting matters to the county court, or appealing from its determination, or paying out money on the faith of it, when he knows or has good reason to believe it may be set aside on appeal.

In *Harris v. Starkey,* 176 Mass. 445, 57 N. E. 698, it was held, on principle, that after distribution of an estate by an executor, acting in good faith and without inexcusable negligence pursuant to a judicial direction within the competency of the court to make under any circumstances, the matter cannot be opened up to enable a person who has been, by mistake or ignorance of the executor and court and without laches on the part of such person, omitted from the order, to the prejudice of the executor; that such person's remedy, aside from obtaining a correction of the order, so far as necessary, is against those who have received the property for contribution to make up his share. Doubtless that states the

general rule.   An administrator or executor is a mere judi-
cial instrumentality in the settling of an estate.   He has a
right, in general, to rely upon the court in disbursing money
coming into his hands.   He is a mere agent, that is all, and
an agent supposed to act with promptness and fidelity under
superior authority.   The negligence in disbursing money, as
executor or administrator, to make him personally liable,
must needs be very manifest,—so great to at least amount to
bad faith, something like what is called gross negligence—
such utter disregard of duty as to amount to constructive in-
tent to wrongly dissipate the funds.

It would be a very hard rule which would excuse a judge
for rendering an erroneous or void judgment and hold his
mere agent, acting in good faith and without inexcusable neg-
ligence, personally liable for acting in reliance upon an order
or judicial direction which the court has competency to make
under any circumstances—considering that such competency
includes power to err to any extent within the broad field of
the subjects in respect to which it has the right to deliberate
and decide.   In *Harris v. Starkey, supra,* we see the distinc-
tion drawn between a typical case of want of jurisdiction of
the subject matter, as, in case of administration upon the
estate of one as dead who is in fact alive, and the situation
where the estate, itself, is presently a proper subject for ad-
ministration though through negligence or ignorance it occurs
in a highly improper manner involving judicial errors of a
jurisdictional character.   The former fits the distribution of
the $20,000 in circuit court, as we have seen, since there was
no jurisdiction of the subject of making or deciding upon a
scheme for distributing the estate of a deceased person inde-
pendently of the testamentary or statutory way.   We do not
see any way for the executors to escape personal responsi-
bility as to that, though we confess it is a great hardship upon
them, since they acted under professional advisers in whom,
under ordinary circumstances, they would have a right to

rely. Moreover, acted on the judicial advice of the circuit judge.

However, on grounds of public policy, it seems, an executor is not protected in distributing the property of the estate he represents by a direction which is wholly void. The twenty-thousand-dollar distribution did not become legalized to any extent because it was allowed as a credit in the county court. The money was disbursed under the circuit court judgment. The former court did not deliberate in regard to it in any respect. The direction of the circuit court was so void of authority as not to form a legitimate basis for action of any sort. It was within the doctrine, void things are as no things. As applied to a judicial direction or adjudication void for want of power, they do not bind any one otherwise than within the rule of estoppel *in pais*. It is well said not to "be attended with any of the consequences of a valid adjudication;" that it neither affects, impairs, nor creates rights; that "As to the person in whose favor it professes to be, it places him in no better position than he occupied before; it gives him no new right, but an attempt to enforce it will place him in peril." "As to the person against whom it professes to be rendered, it binds him in no degree whatever." 1 Black, Judgments, § 170. We may well note in passing, the fact that the state, to the knowledge of the county judge, insisted upon treating the participants in the division of the $20,000 fund as legatees to the extent of four fifths thereof, and they submitted thereto, paying the inheritance tax in due course, thus inferentially confessing there was no power in the court to award the large sum as legitimate expenses or there was some inexcusable fault somewhere resulting in an improper depletion of the estate.

Coming down to the distinctively county court matters, we find a different situation to some extent. The court there had full jurisdiction of the subject matter of settling the es-

tate. Therefore, every order or direction made therein, however erroneous, so far as acted upon by the executors in good faith, protects them. If by reason of such action parties have received money which it is finally determined they have no right to retain, the remedy must be wholly against them. In such a case, as we have seen, the order or direction may be modified so as to clear the way for remedial action against the receiver of the money, and, in a proper case, the remedy against such party may be pursued incidental to the direct attack upon the order

It is not easy to separate utterly void matters in this case from those which are wrong in fact though right in law as regards efficiently protecting the executors against personal liability in acting thereon in good faith.

So, it is considered that, in so far as the trial court held that the executors were personally liable for the overpayments in county court to attorneys and the guardians *ad litem,* error was committed. Whether the error is one of fact or law does not clearly appear. The indications are that the trial court considered that, if there were overpayments, the executors were liable as matter of course, which was wrong. All distributions approved or directed by the formal order, except the $20,000 and the $8,000 to *Mrs. Cowie* and three of the grandchildren, which are referable to the circuit court judgment, must be regarded as having been, however erroneous, made, pursuant to judicial direction, within the jurisdiction of the county court, and as to the executors made within the protection of the rule before indicated.

The foregoing leaves for consideration the questions raised in the several appeals by the persons who received the $10,000, that the appellants from the final order of the county court are estopped from complaining because of their having participated in all proceedings up to and inclusive of the making of it without objecting to what was done, particularly

because of keeping silent till the money was segregated from the trust fund and became the individual property of the recipients.

We are unable to see any elements of estoppel in the matter for want of indications that the parties receiving the money did so to their prejudice, by reason of the attitude of the beneficiaries, if they should be permitted by a change of position to recover.

However, waiver may be just as efficient to extinguish a right as estoppel, and requires no real prejudice to the person receiving the surrender in case of a change of position, as indicated in *Pabst B. Co. v. Milwaukee,* 126 Wis. 110, 105 N. W. 563. As there said, in effect, the defense of waiver does not require any consideration beneficial to the waivor nor any element of estoppel, but it does require that the waivor shall possess the full capacity to surrender the right claimed to have been surrendered. So we turn to an examination of the record and claim of the parties to see whether such capacity exists in this case or not.

Much is said about the presence of Mr. F. G. Cowie, husband of *Mrs. Cowie,* during the proceedings, he being referred to once particularly and other times in general as if he was permitted to largely manage the matter in which the beneficiaries were interested, particularly on the side of his family. The estate as such and the minors by their general guardians do not appear to have been represented at all, either in making the contract for attorneys' fees with Ryan, Merton & Newbury or in adjusting the attorneys' fees at $2,500 for each of the four interests. Mr. Cowie appears to have been in evidence, even to levying $150 on Ryan, Merton & Newbury and a like sum on *Mr. Lockney* after payment to them of $2,500 each, to ward off an appeal, apparently,—another of the singular circumstances in this case.

Now, Mr. Cowie had no authority to bind the minors directly or through their general guardians. His, apparently,

efficient interference in the matter commenced before the illegal circuit court contract and seems to have subsisted to the end. No estoppel can be predicated as to the minors or any member of the Rice family on anything he said or did. He had no grievance and is not to be recognized in the litigation. As to *Mrs. Cowie,* she had no authority to bind any one but herself and she had very little interest any way,—none giving her any legitimate present personal concern in any of the trust fund. She had no authority to bind the minors and could not estop them by her conduct. They were represented in court by their guardian *ad litem,* who seems to have left his duties largely to the mothers of his wards and their attorneys, or left them entirely unrepresented or misrepresented in respect to the proceedings of December 24, 1908, and that of January 9, 1909. The wards had no present interest in the trust fund any way and neither did the adults. The money was in the executors' hands to hold in trust for a time which might probably reach beyond the lives of most of the beneficiaries. The situation was such that, quite likely, some of them would not survive to participate in the fund. Who would be the final takers no one could tell. The share of all the *Rice* children might ultimately fall to *Lloyd (Beebe) Cowie.* The youngest child of *Mrs. Cowie* had a contingent right to the whole. So the entirety might ultimately fall to some one who was a minor when the transactions occurred. The doctrine of estoppel, in the absence of bad faith, as well as the doctrine of waiver, does not apply to such persons. *Blackman v. Baumann,* 22 Wis. 611; *Wilkinson v. Filby,* 24 Wis. 441; Bigelow, Estoppel, 605, 609; 2 Herman, Estoppel, § 1107. In the situation stated we are unable to see how any of the participants in the transactions in question can shield themselves behind an estoppel *in pais.* Possibly they might as to *Mrs. Cowie,* but her interest under the will is so remote that such an estoppel would not make any substantial difference in the result. In any event, the doctrine of

estoppel is based on equitable considerations which do not seem to be sufficient at any point to make it effective here. No one concerned in the matter had any share which would enable him to say anything or do anything which would preclude complaining of the result on behalf of the appellants representing the minors, and they include persons, as we have seen, who may ultimately take the whole net estate and accumulations. Under all the circumstances the executors and attorneys and guardians *ad litem* must be considered as having received, with their eyes wide open so to speak.

The points already discussed and determined render others raised by some one or other of the parties immaterial. We will take occasion now to say that every matter suggested by either party has been examined. Such as have not been and not later specifically noted, have been deemed immaterial in view of the decision upon the others. Practically the whole case on the part of those who advocate the order of the county court and complain of the modification thereof in circuit court, except what appertains to the proper allowance to the executors for expenses in county court, including those for their attorneys, and the allowance to guardians *ad litem*, fails largely on account of dependence upon the utterly void circuit court agreement and the incompetency of any one in the subsequent proceedings, as we shall see, to estop the minors from insisting upon the integrity of the trust by will being preserved, so far as practicable, and carried out. On the other hand, the case on the part of those who challenged the county court's final order on appeal to the circuit court and now complain of the result on such appeal, is, in its main features, supported by the condemnation of the circuit court agreement and judgment.

It is clear from what has been decided that the final result must take a wide range here. The appeal from the county court was from the whole order. The court, with all the parties before it and evidence to show clearly the whole situa-

tion as regards the basis upon which the administration of the estate proceeded from the time the appeal was taken from the admission of the will to probate, had jurisdiction of the whole subject covered by the order. The action as organized in circuit court was not limited, necessarily, to the specific issues tendered by pleadings. The parties mainly interested as appellants were wards of the court. The general appeal and issues tendered, under the circumstances, opened up the whole subject of the validity of the scheme which was illegally substituted for that of Mr. Rice. Only upon that being held valid and the judgment, in form, giving judicial effect to it also valid, could the disbursement of $30,000 for attorneys and guardians *ad litem* fees, particularly any of the $20,000 at first paid out on that account, be sustained. Therefore, the circuit court, had it not erred in refusing to go behind such judgment, would have gotten into a field on the evidence received notwithstanding such ruling where findings would have been required in harmony with the conclusion we have reached. The findings excepted to, allowing attorneys and guardians *ad litem* fees, necessarily reach into a field developing the fact that the whole scheme of administration as regards such expenses had its inception in the circuit court agreement and was dominated thereby to the end. The readjustment of such matter leads to the decision that such scheme was wholly void. That leaves the will as if such scheme had never been thought of. The court cannot make any disposition here or direct any below upon the theory that it, or anything done pursuant to it, was valid. So in remanding, the court must necessarily make such directions as will require a restatement of the executor's account in harmony with the testamentary trust, protecting him from personal liability, so far as he is legally or equitably entitled thereto. That the judgment will strike both ways and heavily upon those who were active in bringing the matter to the attention of the court, cannot be helped. It could not well have been expected

that the expenses for attorneys and guardians *ad litem* would.
be readjusted on lines inconsistent with the substituted
scheme for distributing Mr. Rice's estate, without jeopardiz-
ing all which was done under it, and quite likely require the
court, in vindication of judicial administration, so far as.
possible, to adjudge a restoration of the testamentary trust
to all the dignity which it should have had from the first,
so far as that can be done.    If *Mrs. Cowie,* who, by aid of
her professional and nonprofessional advisers, was largely the
cause of the unfortunate situation and temporarily a chief
gainer thereby, in pursuing the matter to the circuit court
and further here, on behalf of herself and minor child, or
children, unwittingly courted the undoing of the whole il-
legal scheme whereby her father's wishes were displaced,.
largely to her benefit, and so aided, without intending to, in
remedying the mischief so efficiently produced, that can make
no difference.    She, as general guardian, and *Delia A. Rice*
acting in the same capacity, may well have considered the
wards to be truly aggrieved by the destruction of their grand-
father's will and the illegal dispersion of his estate.    If, ap-
preciating their own pecuniary status, they, consciously, made
a great sacrifice, particularly *Mrs. Cowie,* in order to restore
the status of things under the will, so far as possible, that may
well be regarded as quite a redeeming feature of the case and
require, if nothing else does, a reinstatement of the status re-
specting *Mrs. Cowie's* claim as it stood when she surrendered'
it in consideration of the illegal agreement being made for
distribution of her father's estate.    In this connection we will'
say that, it is considered that such claim should be reinstated'
and appropriate proceedings be directed for affording *Mrs.
Cowie* ample opportunity to establish whatever claim she had'
against her father's estate, which she gave up in signing the
circuit court agreement and securing to her full benefit thereof'
in the final termination of the litigation.

We now reach the question of whether the circuit court

rendered a judgment too favorable to the attorneys, guardians *ad litem*, and the executors, raised on the appeal of those who challenge the county court settlement, and whether too favorable to the latter, raised by the five separate appeals taken by the former, having eliminated that part relating to the services of the firm of Ryan, Merton & Newbury and also that part relating to *Mr. Daubner*, except $40 allowed for his appearance in county court prior to the appeal from the order admitting the will to probate. As we have seen, the circuit court erred in failing to hold that the county court should not have allowed any of the $20,000 distributed pursuant to the circuit court agreement, in failing to hold that none of the things done pursuant to such agreement were compensable, and in holding that the agreement under which the $2,500 was allowed to Ryan, Merton & Newbury was valid, and in justifying burdening the trust funds with their claim. We must also hold that the circuit court erred in allowing *Mr. Daubner* anything for appearance as guardian *ad litem* in the county court in view of his having already possessed himself of $2,500 of the trust under the illegal agreement and misrepresented his wards in respect thereto. He pleaded that he earned his part of the circuit court distribution because he substantially saved his wards from surrendering anything, and obtained material present benefits for them, particularly *Lloyd (Beebe) Cowie,* in place of the entire enjoyment being postponed for a long term of years, and that he demanded the concession from *Mrs. Cowie* as a condition of signing the agreement because she owed him. He misconceived his duty as guardian *ad litem*. That was to protect his wards' interest in the testamentary scheme if it was valid, not endeavor to obtain the same or a greater interest by destroying it. Mr. Rice, evidently, arranged the matter as to such wards as he thought was for their best interests, in the long run, and in any event, just as he wanted to. It was one of the duties of *Mr. Daubner,* under the circumstances, to de-

fend the testamentary plan.    Instead of doing that he was, as he testified, one of the leading spirits in displacing it by a scheme taking but a few days, at most, of nonlegal professional work from any viewpoint, and involving a division of one fifth of the estate between himself and his associates. Moreover the incident of demanding a large amount of money from *Mrs. Cowie* as condition of doing that which he assumed to be his duty to his wards, cannot be overlooked.    If it were proper for him to sign the circuit court agreement at all, then it was highly improper for him to demand anything from *Mrs. Cowie* as a condition of doing it, whether she owed money to him or not.    So we cannot well escape the conclusion that since *Mr. Daubner* gained his opportunity to participate in the illegal transaction in the circuit court by his brief connection with the estate in the county court, he should not be allowed anything for his appearance in the matter.

What has been said respecting the scope of the guardian *ad litem's* duty and the departure therefrom by *Mr. Daubner,* applies largely to *Mr. Lockney*.    It was his duty to vindicate the will, if it was valid, rather than to enter into any scheme to supersede it.    He evidently did not appreciate that to enter into the transaction to do the latter and secure $2,500 to himself in the arrangement, participating, in order to do so, in taking $20,000 from the trust fund for division, as was done, was not serving his wards in any proper sense, but such, we are constrained to hold, is the fact.    In the subsequent proceedings in county court there was very little for him to do, strictly, as guardian *ad litem*.    There was nothing requiring him to take any active part in the hearing on claims or any other matter.    The fact that he operated with others under the general arrangement to administer the estate by agreement, and in doing so performed a considerable amount of work which the attorneys for the executors should have done, does not help his case.    It must be looked at from the standpoint of what was reasonably necessary or proper for

him to do for his wards. His compensation was not fixed on
that basis at all, but on that of his legitimately having done
in the settlement of the estate as much as the attorneys for
the executors. That came from the fact, that the whole mat-
ter was handled by agreement and not with reference to legal
duties and responsibilities. Had *Mr. Lockney* merely en-
tered appearance whenever necessary in the proceedings to
enable the court to make a binding and orderly termination,
stimulated the executors and their attorneys to do their duty,
and occupied an advisory or adversary attitude toward them
as occasion required, and otherwise remained passive in the
administration proceedings, unless there was some reasonable
necessity to do otherwise, he would have performed his whole
duty. His power was very limited. It did not extend to
dealing at all with his wards' property rights. He was in
reality an assistant to the court in the administration, with
duties of a *quasi*-official character. He should have occupied
an adversary position wherever his wards' interests were lia-
ble, by any possibility, to be impaired. He could not, prop-
erly, have entered into any private-bargain for his own bene-
fit at the expense of the trust fund, or stipulated it away, or
entered into any agreement, binding on the parties or entitled
to recognition by the court, respecting his own compensation
or that of others concerned in the matter, or, properly, have
remained passive, in respect to a contract known to him to
exist whereby others were assuming, or had assumed, to repre-
sent his wards in the proceedings at their expense, or employ
an attorney, or permit one to be employed, for them without
some extraordinary reason and judicial authorization thereof,
since adequate professional capacity in the premises is sup-
posed to have been requisite to his own appointment. To
stipulate away a ward's property or consent to any judgment
or order adverse to his interests is utterly beyond the guard-
ian's jurisdiction. *Will of McNaughton,* 138 Wis. 179, 118
N. W. 997, 120 N. W. 288. In the circumstances of this

case from the viewpoint of an orderly administration by competent executors represented by competent attorneys, there was little for a guardian *ad litem* to do except to stand guard—(to act in a purely advisory capacity as said in *Smith v. Smith,* 69 Ill. 308, approved in the *McNaughton Case*)— and we could not say there was, necessarily, much of that of a really professional character, without casting grave criticism upon the attorneys for the executors.

Now the basis for compensation for services of a guardian *ad litem,* under all ordinary circumstances, is firmly established by numerous adjudications of this court.    Such rule is quite general, applying to all *quasi* court assistants.    *Richardson v. Tyson,* 110 Wis. 572, 86 N. W. 250; *Speiser v. Merchants' Exch. Bank,* 110 Wis. 506, 86 N. W. 243; *Harrigan v. Gilchrist,* 121 Wis. 127, 99 N. W. 909; *Will of McNaughton, supra.*

Notwithstanding what has been repeatedly said here, the nature of a guardian *ad litem's* duties and the standard by which his compensation should be measured were entirely misconceived in this case.    The office of guardian *ad litem* is not a place to be sought for, or used, or allowed to be used, as a vocational situation like that of an attorney, in general, much less for taking large sums of money from property belonging to wards for private enrichment.    The position is one of trust and confidence toward the ward as well as the court,—to be accepted as matter of duty, to a large extent.    Formerly it was considered entirely of that character and the labor performed, done *cum onere* as said in the *McNaughton Case.* The appointment is for the purpose of aiding the court to adequately protect those who are without capacity to protect themselves.    The acceptor of an appointment to that trust, should be as careful not to do anything, or allow anything to be done, to the prejudice of his ward's interests, as the court from which he receives his appointment, and not to demand, or expect, compensation except upon the high plane of sound

public policy and professional ethics, indicated in the cases cited.

It is considered that, under all the circumstances of this case, the compensation for *Mr. Lockney* in the county court should be limited to $150, that being reasonable, within the meaning of the statute, for full performance of all the duties which devolved upon him. If he did a large amount of the work which properly belonged to the attorneys for the executors or to the executors themselves, as probably was the case, the compensation due to him as guardian *ad litem* does not properly include it.

On one appeal error is assigned because of failure to make a greater reduction of allowance for legal services rendered the executors in county court, and on appeal by the executors error is assigned because of the reduction made.

The evidence relied upon by counsel for the executors is of little help. It was not directed to such services as would have been required had the estate been administered under the will and one attorney, or firm of attorneys, been employed. As indicated in the statement, except for the unnecessary complications, the estate, considering the size, was a very simple one to settle. There were very few claims, no serious contests, one appeal to the circuit court, and that settled without trial, and only a few days' time spent in actual professional work. The will was allowed after a brief hearing and, eliminating the period of substantial suspense by reason of the appeal, the final order was entered in about a year and four months thereafter. Taking account of the service performed by *Mr. Lockney* at the same rate, the reasonable value of all on account of the estate in county court was testified to be some over $20,000, and in both courts $40,000. Without going over the evidence in detail, suffice it to say, the amounts testified to, in connection with the work actually and necessarily done, are so extravagant as to indicate that the witnesses gave evidence upon false bases not only as to the com-

pensable work done but as to the nature of it and the standard by which it should be measured. Much was really clerical work. Probate work, in general, is simple. In the main the work here did not require any very high degree of legal learning or much of it. Generally speaking, the greater part of such work is done, as it evidently was here, by law clerks and junior partners. Eliminating nonprofessional work, such as should be included in the statutory compensation to the executors, and work caused by the disturbance of the testamentary scheme, such professional work as was reasonably necessary to a proper handling of the estate, considering that one attorney, or firm thereof, was sufficient, would seem to fairly measure by $2,500. There was no excuse for directly employing the two firms of the attorneys for the executors and indirectly two others, taking the guardian *ad litem* as one and Ryan, Merton & Newbury as the other, all of which, apparently, by consent of the attorneys so directly employed.

Such unbusinesslike handling of an estate as the record shows merits the severest condemnation as do the claims for the extravagant amounts for doing such work. As has previously been said, if there is any place where property should be really safe from spoliation, it is when *in custodia legis*. Trusts under immediate judicial control, such as those created by law and by will, should be administered with the highest attainable degree of care, fidelity, and economy. There should be no good reason for a popular idea that when property passes into a trust of that kind, it enters a danger zone involving a high degree of uncertainty as to the outcome to the intended beneficiaries. No waste should be permitted and expenses should be kept down to the lowest practicable point. Administrators, executors, and guardians *ad litem* should strive for distinction in this and courts should stimulate that spirit and firmly check all tendencies to useless expenditure or unbusinesslike handling. This court has several times spoken on that subject and, in the whole, established

a policy which will be firmly adhered to and should be referred to for guidance in trial jurisdiction. Such policy has been so long established that it must be presumed to be familiar.

In fixing the allowance to the executors for attorneys' fees in this instance at $2,500 the court has taken into consideration that executors should execute—perform their duties— not take the pay therefor and largely abdicate performance to others, calling all professional services, with a multiplication of attorneys and assistants, as here. In *Harrigan v. Gilchrist, supra,* two attorneys were employed where one was ample. The work was many times that required in this instance and took many times the amount of the highest obtainable professional work, covered many times the period here, and was performed, as was thought, with considerable distinction. The amount of compensation therefor was fixed at $10,000. Many other examples might be given to emphasize the result. The policy of our unwritten law in respect to the matter, till disturbed by the legislature, will be firmly administered here as occasion may arise therefor,—the rule being made more strict rather than softened, if necessary to prevent recurrences, apparent or real, of improper exploitation of similar trusts. Administrators thereof should excel all others in economical, judicious management and approach to the ideal of full performance of legal, ethical, professional, and official obligations.

The result as to the several appeals is this:

On the appeal of the beneficiaries the judgment must be reversed. As to each of the other appeals, the beneficiaries and respondents as one constitute the prevailing party, except as to that part of the judgment adjudging the executors personally liable for excessive disbursements in county court in compliance with orders of such court.

The general policy of giving such directions, in case of a reversal, as will terminate the litigation unless further pro-

ceedings seem reasonably necessary, will be followed here.
The whole history of the subject dealt with appears, probably,
as clearly in the record as it can ever be made to appear.    The
broad superintending control jurisdiction of this court, sup-
plementing its appellate jurisdiction, affords ample compe-
tency to give such directions for closing up the controversies
in the court below in accordance with this opinion, as will
enable such court to readily cover all details of a general de-
cree disposing finally of all complications, as was done in
*Harrigan v. Gilchrist, supra.*

Preliminarily, we will say the litigation, appropriately
under the circumstances, took the cast below, as in the *Harrigan
Case,* of a suit in equity to settle the rights of many parties
and they were appropriately arranged on the record according
to their adversary status, as near as practicable,—the bene-
ficiaries under the trust as plaintiffs, and those charged with
having possessed themselves illegally, or excessively, with por-
tions of the trust fund, or failed to properly account therefor,
as defendants.    So arranged, the court, taking the whole mass
of things into its equity jurisdiction, had ample power to de-
cide all matters raised by the issues tendered, and all others
appearing in the litigation by the undisputed evidence, neces-
sary to be decided to protect the minor beneficiaries.

For all those purposes the general appeal from the county
court opened up the whole subject covered by the final order
as fully as such court might have viewed it, with added power
of the higher jurisdiction as to remedial relief.    The ques-
tion as regards the payment of the $20,000 to the attorneys
and guardians *ad litem* pursuant to the circuit court agree-
ment, was necessarily involved in the litigation.    Solution of
it against the propriety of such payment would have been be-
low, as it has been here, fatal to the agreed displacement of
the testamentary scheme upon the ground that it was utterly
void.    That out of the way there would have been no other
course to pursue, as there is not now, but to require a restate-

ment of the executors' account and restoration of the testamentary trust to what it was designed to be, so far as practicable.

Probably the income improperly paid to the grandchildren cannot, readily, if at all, be recovered back into the trust, nor the income improperly paid to *Mrs. Cowie,* nor the $8,000 of *corpus* distributed to her and the *Rice* children, or for their benefit under the circuit court agreement. But accounting must be had as to each of the several matters, each particular one being covered, remediably, in the general decree, so, in the aggregate, to remedy the improper handling of the trust fund and restore the integrity of Dr. Rice's scheme for the distribution of his property so far as can be. In making such ending, we must keep prominently in view the plain intent of the testator that the entire property and accumulations, with some small exceptions, should remain in the hands of the trustee till the termination of the trust period. He did not intend there should be any disturbance of that part of his plan under any circumstances, so neither the parties nor the court have any right to do so.

*By the Court.*—Judgment is ordered as follows:

1. On the appeal of *Mrs. May R. Cowie* and her associates the judgment of the circuit court is reversed.

2. As to each of the four other appeals the appellants will take nothing, except on the appeal by the executors that part of the judgment adjudging them personally liable for excessive amounts paid for expenses of attorneys and guardians *ad litem* in the county court, is reversed.

3. Costs are awarded in this court in favor of appellants *May R. Cowie* and her associates on all appeals.

4. The cause is remanded to the circuit court with the following directions:

(a) To reverse the final order of the county court in so far as it discharged the executors or is inconsistent with the settlement of the estate as directed by this judgment.

(b) To cause an account to be stated as to *Lloyd (Beebe) Cowie, Lulu C. Rice, Rhea Frances Rice,* and *Magdalena G. Rice,* and charging each with income received and any sum advanced out of the *corpus* of the estate pursuant to the circuit court judgment in the will contest appeal, directing $1,000 to be paid to or for the benefit of the *Rice* children, with interest at four and one-half per cent. per annum on each item from the time received to the date of the accounting of the parties and crediting each with any sum which she was entitled to receive in the meantime under the will, except where payment was made by any one interested instead of out of the trust fund, and in that case giving the credit to that one, and giving credit of interest at the aforesaid rate on each item down to the date of closing the account, the balance in each case to be adjudged to be due to the trustee as a part of the trust fund and be carried by him as a debit charge, with interest added at the end of each year on the total of the account till the termination of the trust, and then disposed of according to the rights of the parties as they shall then appear, the decree to contain appropriate direction in respect thereto in accordance herewith.

(c) To cause an account to be had with *Mrs. May R. Cowie* as to all sums received by her from the trust fund with interest at the rate aforesaid on each item from the time received down to the closing of the account; to grant her a hearing, if applied for, within twenty days after the filing of the *remittitur,* on the claim she released in consideration of supposed benefits received under the will contest judgment, such claim to be considered as revived for that purpose as of the time it was so released, any sum found justly due thereon to be credited on the amount of the items charged to her as aforesaid and a recovery for the balance be adjudged in favor of the trustee—the decree to provide that the same, so far as not paid, shall be carried by the trustee in his account as a charge against her till the termination of the trust,

interest to be accumulated as in other cases and she be credited with any sum coming due to her under the terms of the trust, the balance at such termination to then be disposed of in favor of the parties interested in the trust as a part of the trust fund.

(d) On due application therefor to cause an account to be stated as regards the dealing by executors with the trust fund, charging them, as of the date of the final account in county court, with the amount of the debit total estate as then adjusted, to wit, $187,084.09, with interest on the $28,000 disbursed under the circuit court judgment and crediting them with their expenses and disbursements as therein allowed, save and except said $28,000, to wit, $78,626.25, and also with the deduction of $5,566.35 reported as income and subject to disbursement as such, whereby the balance was arrived at of $74,891.39 with such balance, assuming that the same was turned over to the trustee according to the county court's order, and to provide by the decree for a recovery in favor of the trustee of the balance with interest at the rate aforesaid, brought down to the date of closing the account, the judgment not to be enforced as to the amount represented by any judgment for a recovery of any person, or persons, who had the benefit thereof, till all legal remedies shall have been exhausted to recover the same of such person, and in case of payment to the trustee by the executors of the sum represented by such judgment or any balance thereunder, they to be subrogated to the rights of the trustee in respect thereto.

(e) To provide in the decree for recovery in favor of the trustee from *Henry Lockney* of $4,850, less the amount paid by him for inheritance taxes, with interest on the balance at the rate aforesaid from the time the money was received.

(f) To provide in the decree for a recovery in favor of the trustee of the members of the firm of Connell & Weidner of $6,350, less the amount paid by them for inheritance taxes,

with interest on the balance at the rate aforesaid from the time the money was received by them.

(g) To provide in the decree for a recovery of the surviving members of the firm of Ryan, Merton & Newbury, in favor of the trustee, of $7,500, less the amount paid for inheritance tax by such firm, with interest on the balance at the rate aforesaid.

(h) To provide in the decree for a recovery in favor of the trustee of the surviving members of the firm of Nath. Pereles & Sons of $6,350, less the amount paid by said firm for inheritance taxes, with interest on the balance at the rate aforesaid from the time the money was received.

(i) To provide in the decree for a recovery of *G. Holmes Daubner* of $2,540, less the amount of the inheritance taxes paid by him, with interest on the balance at the rate aforesaid from the time the money was received.

(j) To the end that the decree may be perfected, as indicated, to order the trustee brought in as a party plaintiff and such decree be framed and entered with all convenient speed with all appropriate detail conformable to these directions and this opinion.

The prevailing party, *May R. Cowie* and her associates, will be entitled to tax costs for printing the case on their appeal and for printing one brief, divided equally between the several appeals.

A motion was made by the attorney for the prevailing parties for a modification of the mandate so as to permit the custodian of the trust property to pay such attorney such reasonable compensation for his services in conserving the interests of the *cestuis que trustent* as, to the court, might seem just, and for such further order as to the court might seem just and proper. The motion was supported by affidavit of the attorney to the effect, that the F. G. Cowie mentioned in the decision, pretending to hold written authority from the

beneficiaries, employed such attorney to commence the proceedings to recover into the estate the moneys which had been wrongfully diverted therefrom, on a contingent fee of twenty-five per cent.; that pursuant thereto he rendered the services which resulted in restoration of the trust fund, as indicated in the opinion on file, and that in the situation of the case there is no one authorized to pay for such services out of the trust fund, except upon judicial direction, and that in no other way can he obtain compensation for his valuable services than by burdening such fund therewith.

On the hearing, it was disclosed that F. G. Cowie, after all the transactions had occurred which led to the appeal to the circuit court, in form, obtained a power of attorney to proceed in his discretion to recover any money which had been paid improperly out of the trust fund, he to have fifty per cent. of the amount recovered; and pursuant thereto that he farmed out the work to the attorney for one half such contingent compensation.

The motion was opposed by affidavit, joining issue with some of the allegations of the affidavit in support of the motion and stating that there are facts existing showing the transactions of said Cowie with the beneficiaries, or some of them, in respect to the matter to have been unauthorized and be unconscionable.

In presenting the motion the specific relief requested was departed from. A copy of the written contract between F. G. Cowie and the attorney was produced, reciting that the former held written authority from the beneficiaries to recover to the estate and the heirs moneys and property supposed to rightfully belong to said estate and said heirs, and which had been wrongfully diverted, and that pursuant thereto, on behalf of himself and the beneficiaries, he employed the attorney to take steps therefor upon a contingent fee of twenty-five per cent. of the gross amount recovered. Upon the case thus made the court was requested to modify

the mandate so as to authorize the trustee to carry out such contract.

In support of the motion there was a brief by *C. E. Armin, in pro. per.*

In opposition thereto there was a brief by *George H. Gabel,* attorney for *Lulu C. Rice, Rhea F. Harbaugh, née Rice,* and *Magdalena G. Rice,* beneficiaries under the will.

The following opinion was filed October 8, 1912:

MARSHALL, J.    Perhaps the less said, in addition to what appears in the opinion respecting the events leading up to presentation of the history of the Rice estate the second time in circuit court, the better.    Enough appears in the opinion on file to indicate that the contract whereby F. G. Cowie sought to acquire a large portion of the trust estate and farm out one half of such portion to *Mr. Armin,* forms no legitimate basis for a charge upon the trust fund in favor of the latter.    Neither the *cestuis que trustent* nor any one else could properly destroy the trust created by Dr. Rice in that way any more than by the ways previously attempted.    Plainly, the contract did not contemplate restoration of the legitimate trust but execution of the illegitimate disposition of the property, only contesting the manner of the execution in county court.    It had no greater dignity as to *Armin,* if even that, than the transaction condemned in the opinion.

Notwithstanding the foregoing *Mr. Armin* commenced and conducted the proceedings which, eventually, came to the form of an action to restore the trust created by Dr. Rice and was, in form at least, and in fact, so far as possible, successful.    He was not concerned in any of the transactions which made the appeal from county court necessary.    He was recognized from the time the appeal was taken till the final termination of the matter in this court as the representative of the beneficiaries to secure such relief as they were entitled to. He became, in the course of events, in effect, the representa-

tive of the trust estate to secure its restoration, the same as if
he had been employed by the trustee. He acted as efficiently
as if. he had received such employment by authorization of
the court having jurisdiction of supervising the execution of
the trust. The fact that the result of the litigation was much
more far-reaching than was expected, even by the attorney,
and placed the net property of which Dr. Rice died possessed,
less legitimate expenses of administration, under the control
of the trustee to hold for a long time as was originally de-
signed, instead of under the control of the beneficiaries under
an illegitimate plan of distribution, does not militate against
the fact that *Mr. Armin* so challenged the conduct of all par-
ties concerned with handling the estate, as to bring the whole
subject to the view of this court and within its jurisdiction to
remedy the numerous wrongs which had been committed.
Such being the case, that it is within judicial power to bur-
den the trust estate with such sum for counsel fees for the
services which were beneficial to the trust, in a pecuniary
sense, as is reasonable, under all the circumstances, seems
plain.

The situation was such that there, really, was no trustee to
act in respect to restoring the trust fund. The executors, the
persons named as trustees in the will and the one appointed
by the court, were all adverse to such restoration. In that
situation any *cestui que trust* was a proper party to move in
the matter. The rule is elementary that, the court having
jurisdiction of supervising a trust, may provide for payment
out of the trust fund for reasonable expenses in protecting the
trust. In so doing it does not recognize contracts made by
beneficiaries fixing the amount of compensation as binding.
They are only good to support the claim that the services ren-
dered were not voluntary; that they were requested by those
having such interest as, under the circumstances, to give them
a right to act. The person rendering the service must al-
ways rely upon a mere equitable right to be compensated out

of the property conserved for such reasonable sum as the court shall deem proper for the services reasonably necessary. The rule is thus stated in 2 Beach on Trusts, § 698 (p. 1599):

"It is the duty of the trustee to exercise proper care of the trust property, and where the occasion arises he must see to it that it has adequate defense and protection. This obligation rests upon him *virtute officii*. Where a trustee refuses or neglects to give the trust property such needful protection, it may be done by the *cestui que trust.*" . . .

To the same effect are 2 Perry, Trusts (4th ed.) § 910; *Dunham v. W. Steele P. & P. Co.* 100 Mich. 75, 58 N. W. 627; *Rogers v. Vaughan,* 31 Ark. 62, 70.

In such a situation as existed in this case, the primary duty of restoring the trust rested with the trustee. The *cestuis que trustent* possessed the right to act in place of the trustee from the nature of the case. The work performed was, in practical effect, for the trustee as well as for the beneficiaries. It was the same, in reality, as if performed under contract with the former. Reasonable attorney's fees for services actually and rightfully rendered, doing that which is reasonably necessary in conserving a trust estate, are allowable to the trustee as expenses, and may be allowed direct to the attorney, chargeable to the trust fund. They are always within the discretion of the court,—not controlled by contract. 2 Perry, Trusts (4th ed.) § 910. The right to compensation where the services, from the necessities of the case, are performed on request of the *cestuis que trustent* is to be considered, with reference to whether they were reasonably necessary, were in fact beneficial to the trust, the amount and nature of the services and extent of the resulting benefits. They are also to be fixed upon the basis of compensation for somewhat similar services in official life, rather than the customary charges as between attorney and client. Such situation should be classed with those dealt with in *Harrigan v.*

*Gilchrist,* 121 Wis. 127, 436, 99 N. W. 909; *Tyson v. Richardson,* 103 Wis. 397, 79 N. W. 439; *Richardson v. Tyson,* 110 Wis. 572, 86 N. W. 250.

Within the rules mentioned it is proper for this court to fix the amount allowed to *Mr. Armin* for counsel fees in this court and the trial court as well, since the record satisfactorily shows all the facts. Ordinarily, this court will not go further than to fix the compensation for services rendered on the appeal, leaving the court below to deal with the matter of services rendered there, under advisory or prescribed directions as seems best; but, in such extraordinary situations as we have here in this case, the better administration is to cover the entire field and terminate the litigation in all respects. That was done in *Harrigan v. Gilchrist,* 121 Wis. 127, 460, 99 N. W. 909. The reasons which moved the court to take that course then apply quite as forcibly now.

Much of the work by *Mr. Armin* was not directed to the particular result reached. The overshadowing question in the case—that upon which it turned in the main—was not very helpfully treated, if, even, at all except incidentally. Considering only the services directed in some way to the beneficial result reached, having reference to the integrity of the trust as created by Dr. Rice, and the enlightenment afforded this court in its progress to that end; leaving out of view the labor which only incidentally brought to attention here and within this court's jurisdiction that which became, in the end, the dominant subject dealt with—labor which was, primarily, calculated to bring about another result, not in harmony with the trust as created by Dr. Rice, it is considered that seven hundred dollars ($700) will reasonably compensate *Mr. Armin* therefor and for his disbursements in the circuit court and this court, including such services as may be necessary in order to perfect the judgment in the circuit court according to the directions given here.

The mandate is hereby changed so as to direct payment to *Mr. Armin,* accordingly, of said sum of seven hundred dollars ($700) in full for all the services and disbursements mentioned, such payment to be made out of the income of the trust fund; but only after judgment as here directed shall have been duly perfected below.